# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BIZZELL CORPORATION                  CIVIL ACTION
1712 Pioneer, Suite 135
Cheyenne, WY  82001,                 No.

                    Plaintiff,

            v.

TRIPWIRE SOUTH, LLC
1475 Highland Avenue Road
Gettysburg, PA  17325,

TRIPWIRE AVIATION LLC
1475 Highland Avenue Road
Gettysburg, PA  17325,

RYAN MORRIS
1425 Knoxlyn-Orrtanna Road
Orrtanna, PA  17353,

                    Defendants.

## <u>VERIFIED COMPLAINT</u>

Plaintiff Bizzell Corporation ("Bizzell" or "Plaintiff") by and through its undersigned counsel, files this Verified Complaint against Defendants Tripwire South, LLC ("Tripwire South" or "Tripwire"), Tripwire Aviation LLC ("Tripwire Aviation") and Ryan Morris ("Morris") (together, "Defendants") and avers as follows:

## NATURE OF CASE

1.    This case is about fraud perpetrated by a local businessman, part-time Liberty Township police officer, and Gettysburg Area School District school board member in a deal for more than 230,000 lbs. of high explosives and accelerant powders, which were to be used for artillery shells to support the war efforts of our embattled allies Ukraine and Israel during their time of dire need.  Plaintiff Bizzell Corporation paid $3.9 million to Defendants Ryan Morris and his entity Tripwire South, LLC, but he defrauded Bizzell and failed to deliver any of what was promised.

2.    Morris lied about having high explosives available to sell, and even provided false photographs and Safety Data Sheets, all to induce Bizzell to pay immediately (just shy of $1 million).  Morris had no high explosives to deliver, but kept Bizzell's money anyway.  And Bizzell paid $2.9 million for the accelerant powders, but instead of delivering them to Bizzell, Morris sold them to an Eastern European buyer at a higher price, again without returning Bizzell's money.

3.    While he should have returned Bizzell's $3.9 million, Morris apparently used the funds to purchase multiple helicopters, real estate, numerous Rolexes, and otherwise enjoy a lavish, unearned lifestyle, during and after declaring personal bankruptcy.

4.      Morris's fraud, deceit, and breaches of contract undermined Bizzell's efforts to support U.S. allies during a period of intense international conflict and tension, solely to pad his own pockets with ill-gotten funds. The millions fraudulently taken from Bizzell must be returned, and Bizzell must be compensated for the cost of procuring this materiel from other suppliers at the prevailing higher prices.

## INTRODUCTION

5.      Plaintiff Bizzell entered into several contracts with Defendant Tripwire in April and June 2024. Bizzell fulfilled its obligations, paying Tripwire not less than $3.9 million for (a) 41,000 lbs. of the high explosive Composition B ("Comp-B"), and (b) 190,000 lbs. of accelerant powders. Tripwire failed to deliver any of it.

6.      The Comp-B was a key input for artillery shells destined for the Ukrainian Ministry of Defense, at a time when Russia was firing more than 10,000 shells a day on the Ukrainians, and when Russian munitions production could sustain an even greater rate of daily shelling. By contrast, Ukraine could sustain a rate of fire of only about 2,000 shells per day, and its Western allies were working feverishly to expand shell production capacity. Bizzell's contract with Tripwire for Comp-B was part of this effort to help Ukraine achieve parity.

7.     The accelerant powders were to be used for munitions for the Israel Defense Forces ("IDF"), at a time when they were fending off rocket barrages from Iran and engaged in combat against Iran's proxies on multiple fronts.  After months of heavy combat in Gaza, the IDF was facing increased pressure from Hezbollah in Lebanon and urgently needed to replenish munitions.  Bizzell's contracts with Tripwire for powders were part of this effort.

8.     Bizzell paid $3.9 million to Tripwire only because of the fraud and deceit of Tripwire's President and owner, Ryan Morris.  Morris lied about having Comp-B to sell, and provided fraudulent photographs to convince Bizzell it was almost ready for shipment.  Morris lied that he needed Bizzell's immediate payment for the Comp-B.  He said he already signed a contract with the U.S. Government to obtain the Comp-B, and needed to pay.  Morris lied about entering into a separate contract with a vendor to process the Comp-B into flake for Bizzell, all to induce Bizzell to quickly transfer the funds for the first order of 41,000 lbs., while at the same time trying to convince Bizzell to pay for another 160,000 lbs. (at an additional cost of $4 million).  The truth was that Morris had no Comp-B to sell, and no ability to obtain it.

9.     Morris similarly lied about the powders.  First, he falsely invoiced Bizzell for more than $7 million worth of powders that Bizzell never ordered (but expressly rejected).  And later, he lied about the powders Bizzell actually ordered,

claiming they were being held in Tripwire's Gettysburg facility until Bizzell could facilitate shipment, when in fact he sold them to a different buyer in Eastern Europe at a higher price.

10.    As if these fraudulent business practices were not bad enough, Morris somehow believes he gets to keep the $3.9 million Bizzell paid, despite never delivering anything in return.

11.    And it gets worse.  After taking Bizzell's payments, Morris began to splurge on an opulent personal lifestyle, buying Rolexes for himself and key employees, while simultaneously claiming in his personal bankruptcy (commenced in October 2024, Case No. 1:24-bk-02535 (Bankr. M.D. Pa.), Van Eck, J.) to earn only about $5,000 per month as Tripwire's President.  Morris failed to disclose to the Bankruptcy Court *any* ownership interest in Tripwire South.  Instead, he conveniently disclosed an ownership interest only in a defunct, bankrupt business entity that he previously used for carrying on Tripwire's business, which owed millions to creditors with no apparent revenue streams.  He concealed his ownership interest in Tripwire South, which was flush with cash fraudulently taken from Bizzell.

12.    Further, in his personal bankruptcy proceeding, Morris reported that his then-fiancée's income was also $5,000/month, for a combined household income of $10,000/month, with reported expenses of about $11,000/month.  While

he represented to the Bankruptcy Court that they could not cover their monthly expenses, they were deep into planning their June 2025 wedding at one of Ireland's most expensive, Five-Star luxury wedding hotels, the Mount Juliet Estate in County Kilkenny, which carries a steep price tag.  The RSVP deadline was five days before Morris's personal bankruptcy case closed.  Where the money for such a costly, over-the-top wedding came from is a mystery only this case can unravel.  Upon information and belief, the funds were stolen from Bizzell.

13.     Further, upon information and belief, Morris has attempted to hide funds stolen from Bizzell by transferring them to third-parties, including new business entities he set up.  For instance, in July 2024, just after taking Bizzell's payment for Comp-B that Morris knew he did not have to sell, Morris formed a new subsidiary, Tripwire Aviation LLC.  After taking $3.9 million from Bizzell, the newly formed Tripwire Aviation suddenly purchased multiple helicopters, including an MD500D at a cost of $1 million, and installed $350,000 in optical equipment on the helicopter, despite not having any paying customers.

14.     Tripwire Aviation co-owner Michael Dickerson, who is also the Gettysburg Area School Board Vice President, bragged to the media at a recent public relations event—where Tripwire gave local municipal and County officials free rides in the helicopter—that the MD500D is akin to a "Ferrari."

15.     Tripwire Aviation then purchased a Hughes/Schweizer 269C helicopter, again without any apparent revenue streams (other than funds pilfered from Bizzell).

16.     And Morris has attempted to launder funds taken from Bizzell through related-party real estate transactions.  In February 2025, for instance, he caused Tripwire (flush after defrauding Bizzell) to pay him $416,000 for his old granite quarry property adjacent to Tripwire's headquarters in Gettysburg, where he is now building helicopter pads for Tripwire Aviation (again without Tripwire Aviation having any apparent legitimate revenue streams from which to make such capital investments).

17.     Morris holds Tripwire out as a federal defense contractor and active participant in the military supply chain.  Tripwire claims to be a key subcontractor, along with Astor Defense, supporting Global Ordnance LLC dba Global Military Products' $450 million Department of Defense contract for TNT.  Tripwire also claims to be a key subcontractor providing drone warheads for Department of Defense contracts.  Tripwire's brazen fraud in its dealings with Bizzell would appear to be all the more surprising, therefore, given the severe consequences with which fraud is punished in federal contractor suspension and debarment proceedings.

18.     Yet Morris's business history reveals that Bizzell is not the first customer he has defrauded using the same playbook.  The Republic of Qatar, for example, obtained a civil fraud judgment against the previous entity Morris used to carry on Tripwire's business, after Morris took the Qatari's payments, but then failed to deliver the explosive products, after stringing the Qataris along for more than a year with promises that the shipment would soon be on its way.  Upon information and belief, there are multiple other examples of similar fraud, with victims ranging from Morris's former business partners, to U.S. based defense contractors and intermediaries, to NATO ally defense contractors, and even Florida police departments.

19.     Further, Morris's business history reveals that his habit of using corporate assets to fund his personal lifestyle is not new either.  For example, when he commenced a bankruptcy proceeding for the entity he previously used to conduct Tripwire business, the 90-day look-back disclosures revealed that he used company assets to pay for his personal vehicle, personal tractor, and testosterone injections.

20.     Morris continued this fraudulent pattern in his dealings with Bizzell. He and his Tripwire Group have not only taken millions of dollars from Bizzell and severely damaged its business, but they also delayed and undermined delivery of mission-critical munitions to United States' embattled allies.

## PARTIES

21.     Bizzell Corporation is a certified Veteran Owned and Service-Disabled Veteran Owned Small Business ("SDVOSB"), incorporated under the laws of Wyoming, headquartered in Cheyenne, Wyoming.  Bizzell is a defense contractor to the U.S. Government and NATO allies.  Bizzell provides intelligence, logistics, training, and contingency operations services to its customers.  Bizzell also produces munitions in its own factories and facilitates the military supply chain of allies, including delivery of much needed shells for the Ukrainian Army, and explosive powders to IDF munitions contractors.

22.     Ryan J. Morris is the President and controlling owner of Tripwire South and Tripwire Aviation.  Morris owns and controls a number of alter-egos sharing the Tripwire name, including Tripwire South and Tripwire Aviation, which collectively form the Tripwire Group.  Morris resides at 1425 Knoxlyn-Orrtanna Rd, Orrtanna, PA 17353.  Morris is a member of the Gettysburg Area School District School Board, and also a part-time sergeant with the Liberty Township Police Department.  Morris is sued in his personal capacity only.

23.     Tripwire South, LLC is a limited liability company formed under the laws of the state of Florida, with its principal place of business in Gettysburg, Pennsylvania.  Kenneth Hassinger, President of the Gettysburg Area School District Board of Education, joined Tripwire South in or around October 2024.

When Tripwire South's articles of organization were filed in April 2021, its members consisted of Morris, a Pennsylvania citizen; Charles Arant, a Florida citizen; Susan Boully, a Florida citizen; Ashley DeLauter (Morris's wife), a Pennsylvania citizen; and Josh Mills (Tripwire South's Chief Operating Officer), a Pennsylvania citizen.  As of February 2022, Tripwire South's disclosed membership consisted of Morris (Pennsylvania); Arant (Florida); and Boully (Florida).  Upon information and belief, no member of Tripwire South is a citizen of Wyoming.

24.     Tripwire Aviation LLC is a limited liability company formed in July 2024 under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Gettysburg, Pennsylvania.  Tripwire Aviation is a new addition to Morris's Tripwire Group, which Morris controls.  Michael Dickerson, the Gettysburg Area School District Board of Education Vice President, is also a member of Tripwire Aviation, and its Chief Operating Officer.  Upon information and belief, no member of Tripwire Aviation is a citizen of Wyoming.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).  Bizzell is a citizen of Wyoming.  Tripwire South is a limited liability company whose ultimate membership, upon information and belief, consists of Pennsylvania and Florida citizens.  Tripwire Aviation is a limited

liability company whose ultimate membership, upon information and belief, consists of Pennsylvania citizens, including Morris and Dickerson.  Upon information and belief, no member of Tripwire South nor Tripwire Aviation is a citizen of Wyoming, so complete diversity of citizenship exists here.

26.     The amount in controversy exceeds $75,000.

27.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), -(b)(2), and -(c)(2), because Morris, Tripwire South, and Tripwire Aviation reside in the Middle District of Pennsylvania.  Moreover, a substantial part of the events or omissions giving rise to Bizzell's claims occurred in the Middle District of Pennsylvania and a substantial part of property involved is situated therein.

## FACTS

### I.     Morris defrauded Bizzell out of $910,954 it paid for Comp-B.

28.     In May 2024, Bizzell and Morris began discussions about Bizzell's need for a sizeable quantity of Comp-B.  Comp-B is a high explosive, comprised of RDX and TNT, and is the main explosive in artillery shells, rockets, land mines, and hand grenades.  Bizzell needed Comp-B to supply artillery shells destined for Ukraine.

29.     In early June 2024, Morris represented to Bizzell that Tripwire could sell approximately 200,000 lbs. of Comp-B that had purportedly been demilitarized ("demilled") at the Hawthorne Army Depot ("HWAD") in Hawthorne, Nevada.

11

("Demilled" here means to remove the Comp-B from unfired rockets, as aging stockpiles are eliminated, so the explosives can be used in new munitions.)

30.     Bizzell expressed interest in the Comp-B.  Tripwire assured Bizzell that if Bizzell purchased the Comp-B, it would just need to be repacked.

31.     To close the sale, Morris promised to have the Comp-B "flaked" into smaller pieces.  Morris and Tripwire knew that Bizzell intended to use the Comp-B for artillery shells and assumed that flaking rocket-sized Comp-B cylinders into smaller chunks for recasting into shells would be attractive to Bizzell.  Morris even assured Bizzell that Tripwire had signed an agreement to have the Comp-B flaked.

32.     On June 5, 2024, to prove that the Comp-B was available for sale, upon Bizzell's request, Morris provided multiple photos, purportedly of the Comp-B Tripwire had available.



Attached hereto as **Exhibit A**, which is incorporated herein by reference, are true and correct copies of additional photos provided by Morris.

33.    Also, upon Bizzell's request, Morris provided Safety Data Sheets, again purportedly for Tripwire's Comp-B.  Attached hereto as **Exhibit B**, which is incorporated herein by reference, are true and correct copies of records that include one of the Safety Data Sheets.

34.    On or about June 7, 2024, Bizzell ordered **41,407 lbs.** of Comp-B. The same day, Tripwire issued Invoice No. 1629, for a total price of **$910,954**. Attached hereto as **Exhibit C**, which is incorporated herein by reference, is a true and correct copy of Invoice No. 1629, stamped "PAID."

35.    Bizzell wired $910,954 to Tripwire on June 7, 2024, in full payment of Invoice No. 1629.  Attached hereto as **Exhibit D**, which is incorporated herein by reference, is a true and accurate copy of the wire transaction confirmation; *see also* Ex. C.

36.    Prior to and after receiving Bizzell's payment on June 7, Morris repeatedly assured Bizzell that delivery of the Comp-B would be made within 20 days.  For example, on June 14 and 15, 2024, Morris assured Bizzell that the Comp-B was at HWAD and would be ready in 14 days.

37.    Despite Morris's assurances that the Comp-B would be available for delivery within 20 days, and despite Bizzell's full payment, to date Tripwire has

failed to deliver.  Bizzell received no Comp-B from Tripwire whatsoever, despite paying Tripwire nearly $1 million.

38.    Bizzell attempted to cancel the contract for Comp-B on July 12, 2024, and obtain a refund from Tripwire, but Tripwire refused to return a penny of Bizzell's $910,954.

39.    Bizzell learned that Morris engaged in fraudulent misrepresentations throughout the sales process.  Despite Morris's repeated assertions regarding the Comp-B being ready for delivery, Bizzell discovered that Morris and Tripwire never had access to—or the ability to sell—demilled Comp-B from HWAD.  The Army had not yet authorized its sale to private parties.  Bizzell learned that the Comp-B Tripwire took payment for had not even been demilled, and that Tripwire had no rights in the Comp-B to sell.

40.    Morris's continued assurances of delivery within 20 days, his photos of the purported Comp-B, his Safety Data Sheets, and his promises that the Comp-B was in the process of being flaked for Bizzell, were fraudulent.

41.    In the wake of Tripwire's failure to deliver the Comp-B, Bizzell was forced to scramble and devote considerable time and resources to locating alternative supply to fulfill its contract for artillery shells destined for Ukraine.

42.    Bizzell continues to search for a replacement supply of Comp-B, but has not located a source.  Tripwire is liable for the difference between its price and

what Bizzell will ultimately pay to a replacement source, in addition to returning Bizzell's payment.

**II.    Morris defrauded Bizzell out of $2,991,360 it paid for Black and M6 Powders.**

43.    In April 2024, Bizzell conveyed to Tripwire that it was in the market to purchase accelerant powders, and was interested to learn whether Tripwire had any for sale.  Morris responded that Tripwire could sell M1, M6, M26, M30, and black powders.  Bizzell made clear that it would only place orders for powders that passed testing and inspection as a precondition, as is customary in the industry.

44.    During this typical pre-sale due diligence phase, Bizzell declined to order the M1, M26, and M30 powders because they failed inspection.  Bizzell discovered that these powders dated from the 1960s (or had other flaws), which Morris attempted to conceal.

45.    Bizzell agreed to purchase **75,000 lbs.** of black powder from Tripwire.  Tripwire sent Invoice No. 1598 for a total cost of **$1,025,000** for the black powder.  Attached here to as **Exhibit E**, which is incorporated herein by reference, is a true and correct copy of Invoice No. 1598.  Bizzell paid the invoice in full.  Attached hereto as **Exhibit F**, which is incorporated herein by reference, is a true and correct copy of the payment confirmation.

46.    Bizzell also agreed to purchase **95,920 lbs.** of M6 High Explosive powder from Tripwire.  Tripwire sent Bizzell Invoice No. 1631 for a total cost of

**$1,966,360** for the M6 powder.  Attached hereto as **Exhibit G**, which is incorporated herein by reference, is a true and correct copy of Invoice No. 1631.

47.    On June 15, Morris texted Bizzell, representing that the "M powders" were in North Carolina and West Virginia and that the black powder was in Gettysburg.  Two days later, relying on Morris's representations, Bizzell paid the **$1,966,360** M6 powder invoice in full.  Attached hereto is **Exhibit H**, which is incorporated herein by reference, which demonstrates a proof of payment.

48.    In September 2024, Tripwire personnel conveyed that the powders Bizzell had purchased were packaged and ready for pickup in Gettysburg.  Morris assured Bizzell that the powders would be delivered.

49.    Tripwire, Bizzell, and Bizzell's logistics agent corresponded regularly in the weeks that followed as the parties obtained export licenses, inspection certificates, and worked on other details to prepare for international shipment of the powders.

50.    When Bizzell provided the final license Tripwire requested, which the parties understood was the last step before shipment, Morris cut off all communications with Bizzell.  Despite taking Bizzell's payments and stringing Bizzell along in a lengthy process of arranging shipment, Tripwire failed to deliver any of the powders.

51.    Bizzell subsequently learned that in or around November 2024, Tripwire sold the powders to an Eastern European company at higher price, after Bizzell already paid for the same goods.

52.    Bizzell has received no black powder or M6 powder from Tripwire, despite paying nearly $3 million, which must be returned.

53.     In the wake of Tripwire's failure to deliver the powders, Bizzell was forced to scramble and devote considerable time and resources to locating alternative supply to fulfill its contract with an Israeli defense company that needs the powders for IDF munitions.

54.    Although Bizzell has been able to locate at least a partial replacement supply of the black powder, the price per pound for the replacement supply is 15%–25% higher than what Bizzell paid Tripwire.  Tripwire is liable for the difference, in addition to returning Bizzell's payment.  Despite its best efforts, Bizzell has not been able to locate any replacement supply for the M6 powder, but continues its search, and Tripwire will be liable for the difference once a replacement source is found.

## III.    Morris diverted Bizzell's payments to himself and other Tripwire Group companies, instead of returning them to Bizzell.

55.    Morris defrauded Bizzell on behalf of and through Tripwire, caused Tripwire to breach its agreements with Bizzell, then attempted to use the fictitious liability shield of his Tripwire Group to complete his fraud and evade

responsibility. Tripwire South and Tripwire Aviation constitute little more than legal fictions and are Morris's alter egos.

56.    Upon information and belief, Tripwire Aviation, set up by Morris and Dickerson just after receipt of Bizzell's sizeable payments that Morris never intended to return, used Bizzell's money to purchase at least one MD500D helicopter, which Dickerson boasted is akin to a "Ferrari," with an estimated operational cost of nearly $600 per hour, a purchase price of $1 million, and an additional $350,000 of optical equipment. Upon information and belief, Tripwire Aviation has also used Bizzell's money to purchase one or more additional helicopters, including a Hughes/Schweizer 269C.

57.    In addition to marketing itself as a purveyor of helicopter-borne training for first responders, Tripwire Aviation has publicized its intention to make its MD500D and 269C available to municipal entities in Adams County, Pennsylvania, including the Liberty Township Police Department, where Morris is a part time law enforcement officer. Morris has expressed his intention to acquire a "fleet" of helicopters, portending further outlays of Bizzell's money and complicating Bizzell's efforts to recover its funds before they become irretrievable.

58.    Morris and Dickerson seek a financial and public relations windfall by making the helicopters available to Liberty Township's Public Safety Support Program free of charge, and are pitching Adams County and even the

Commonwealth on the prospect of using Tripwire Aviation's helicopters for search and rescue missions. Morris has appeared in numerous news articles on the subject and indicated that he "expects" Liberty Township to help him seek federal grants to cover associated costs of the helicopters.

59.     After Tripwire pocketed Bizzell's money, Morris diverted those assets away from Tripwire, and siphoned company funds that he used to purchase multiple Rolex watches, lavish gifts, and capital investment in Tripwire Aviation.

60.     Morris has also shown disregard for corporate formalities in his management and ownership of Tripwire and has engaged in significant commingling of Tripwire's assets and his own. In February 2025, Morris engaged in a related-party transaction, selling his real property located at 1800 Baltimore Pike in Gettysburg, Pennsylvania, to Tripwire South for $416,000 and transferring the funds to himself, indicating a lack of respect for the corporate form and for Tripwire as a separate entity.

61.     During his Chapter 7 bankruptcy proceeding, which spanned October 2024 to January 2025, Morris informed the U.S. Bankruptcy Court for the Middle District of Pennsylvania that he owned no Rolexes, had little cash, and did not disclose receiving proceeds from the sale of Tripwire assets (or his ownership interest therein), to secure the discharge of his debts. If that were all true, then the posh European destination wedding that Morris and his fiancée were planning

could only have been paid for with Tripwire funds.  Morris, after all, earns $23.92 per hour as a part-time police officer with Liberty Township.  Tripwire is thus a mere façade for the operations of Morris, its principal and dominant member.  He abused his position as Tripwire's controlling owner to divert corporate assets (wrongfully taken from Bizzell) to himself.

62.     As the specific, unusual circumstances of this case demonstrate, the fundamental unfairness of this situation is patent, and injustice would occur if Morris were not made personally responsible for his and Tripwire's transgressions against Bizzell.  Moreover, permitting Morris to shield himself from liability by invoking the corporate form would defeat public policy and encourage fraud.

63.     Bizzell therefore brings this action against Morris, Tripwire South, and Tripwire Aviation to recover the $910,954 it paid for Comp-B and the $2,991,360 it paid for black and M6 powders, which together total $3,902,314, plus the additional cost of replacement supply, and all incidental and consequential damages.

## COUNT I

## FRAUD

64.     Bizzell restates the above paragraphs as if fully set forth herein.

65.     Tripwire, through Morris and other agents, made multiple representations to Bizzell regarding Comp-B that Tripwire purportedly had ready for sale to Bizzell, including that:

> a.     Tripwire could sell approximately 41,000 lbs. of Comp-B (indeed 200,000 lbs.) that had already been "demilled" at HWAD in Hawthorne, Nevada;

> b.     Tripwire could make the demilled Comp-B available 20 days after payment because all that was required to deliver it to Bizzell was repacking;

> c.     Tripwire had the Comp-B in its possession or control;

> d.     Tripwire had Safety Data Sheets corresponding to the Comp-B;

> e.     Tripwire could have the Comp-B flaked, which would make it better suited for Bizzell's purposes; and

> f.     Tripwire had signed an agreement to have the Comp-B flaked.

66.     Morris and Tripwire made these representations knowing that they were false.

67.    In the alternative, Morris and Tripwire made these representations with reckless disregard for their truth or falsity.

68.    Morris and Tripwire made these representations with the intent to mislead Bizzell into believing that Tripwire had Comp-B and M6 and black powder in its possession or control so that Bizzell would enter into contracts with Tripwire to purchase the Comp-B and powders.

69.    Bizzell was justified in relying on Morris and Tripwire's false representations, and would not have paid Tripwire but for these lies.

70.    Without Morris and Tripwire's false representations, Bizzell would not have entered into contracts with Tripwire to purchase Comp-B and M6 and black powder, nor paid any amounts to Tripwire.

71.    Morris and Tripwire continued to make false representations to Bizzell during the months after Bizzell paid for the powders, when the parties were engaged in obtaining export licenses, certifications, and arranging logistics. Tripwire falsely represented that it was preparing to deliver the powders to Bizzell, when in fact it was arranging for the sale of the same powders to a different buyer from Eastern Europe.

72.    Bizzell incurred damages as a result of Morris and Tripwire's fraudulent conduct, including but not limited to the loss of the $910,954 Bizzell paid Tripwire for Comp-B and the $2,991,360 it paid Tripwire for M6 and black

powder, as well as the cost of obtaining replacement supply at higher prices, as well as further consequential and incidental damages.

73.    Bizzell has also suffered substantial reputational damage in its professional community as a direct result of Morris and Tripwire's fraudulent conduct.

74.    Morris and Tripwire acted with reckless indifference to Bizzell's rights in their persistent fraudulent deception and their conduct merits further sanctions to achieve punishment and deterrence.  Thus, Bizzell is entitled to an award of punitive damages.

## COUNT II

### FRAUDULENT INDUCEMENT

75.    Bizzell restates the above paragraphs as if fully set forth herein.

76.    Tripwire, through Morris and other agents, made multiple representations to Bizzell regarding Comp-B that Tripwire purportedly had ready for sale to Bizzell, including those recited in ¶ 65 *supra*.

77.    Morris and Tripwire made these representations knowing that they were false.

78.    In the alternative, Morris and Tripwire made these representations with reckless disregard for their truth or falsity.

79.     Morris and Tripwire made these representations with the intent to mislead Bizzell into believing that Tripwire had Comp-B and M6 and black powder in its possession or control so that Bizzell would enter into contracts with Tripwire to purchase the Comp-B and powders.

80.     Bizzell was justified in relying on Morris and Tripwire's false representations.  Without Morris and Tripwire's representations, Bizzell would not have entered into contracts with Tripwire to purchase Comp-B and M6 and black powder.

81.     Morris and Tripwire's false representations were made with specific intent to induce Bizzell to enter into contracts when Bizzell had no duty to do so.

82.     Bizzell incurred damages as a result of Morris and Tripwire's fraudulent conduct, including but not limited to the loss of the $910,954 Bizzell paid Tripwire for Comp-B and the $2,991,360 it paid Tripwire for M6 and black powder, as well as the cost of obtaining replacement supply at higher prices, as well as further consequential and incidental damages.

83.     Bizzell has also suffered substantial reputational damage in its professional community as a direct result of Morris and Tripwire's fraudulent conduct.

84.     Morris and Tripwire acted with reckless indifference to Bizzell's rights in their persistent fraudulent deception and their conduct merits further

sanctions to achieve punishment and deterrence.  Thus, Bizzell is entitled to an award of punitive damages.

## COUNT III

## BREACH OF CONTRACT (COMP-B)

85.     Bizzell restates the above paragraphs as if fully set forth herein.

86.     Bizzell and Tripwire entered into a valid, binding, and enforceable contract, the essential terms of which included Tripwire delivering to Bizzell 41,407 lbs. of Comp-B in exchange for payment of $910,954 from Bizzell.

87.     Accordingly, Bizzell paid Tripwire $910,954, fulfilling its obligations under the Comp-B contract.  Tripwire received and acknowledged Bizzell's payment.

88.     Tripwire promised to deliver the Comp-B within 20 days, but failed to do so, thereby breaching its contract with Bizzell.

89.     Tripwire thereafter sought to cancel its order and receive its money back.  To date, Tripwire has neither delivered the Comp-B promised under the contract nor returned the $910,954 Bizzell paid Tripwire, thereby breaching the Comp-B contract.

90.     Bizzell has incurred damages as a result of Tripwire's breach, including but not limited to the loss of the $910,954 it paid Tripwire for Comp-B

and the cost of obtaining replacement supply at a higher price, as well as

consequential, incidental, and any other measure of damages under applicable law.

## COUNT IV

### BREACH OF CONTRACT (BLACK POWDER)

91.    Bizzell restates the above paragraphs as if fully set forth herein.

92.    Bizzell and Tripwire entered into a valid, binding, and enforceable

contract, the essential terms of which included Tripwire delivering to Bizzell

75,000 lbs. of black powder in exchange for payment of $1,025,000 from Bizzell.

93.    Accordingly, Bizzell paid Tripwire $1,025,000, fulfilling its

obligations under this contract.  Tripwire received and acknowledged Bizzell's

payment.

94.    To date, Tripwire has neither delivered the black powder promised

under the contract nor returned the $1,025,000 Bizzell paid, thereby breaching the

black powder contract.

95.    Bizzell has incurred damages as a result of Tripwire's breach,

including but not limited to the loss of the $1,025,000 it paid Tripwire for the black

powder and the cost of obtaining replacement supply at a higher price, as well as

consequential, incidental, and any other measure of damages under applicable law.

## COUNT V

### BREACH OF CONTRACT (M6 POWDER)

96.    Bizzell restates the above paragraphs as if fully set forth herein.

97.    Bizzell and Tripwire entered into a valid, binding, and enforceable contract, the essential terms of which included Tripwire delivering to Bizzell 95,920 lbs. of M6 powder in exchange for payment of $1,966,360 from Bizzell.

98.    Accordingly, Bizzell paid Tripwire $1,966,360, fulfilling its obligations under the contract.  Tripwire received and acknowledged Bizzell's payment.

99.    To date, Tripwire has neither delivered the M6 powder promised under the contract nor returned the $1,966,360 Bizzell paid, thereby breaching the M6 contract.

100.   Bizzell has incurred damages as a result of Tripwire's breach, including but not limited to the loss of the $1,966,360 it paid Tripwire for M6 powder and the cost of obtaining replacement supply at a higher price, as well as consequential, incidental, and any other measure of damages under applicable law.

### COUNT VI

### RESCISSION AND RESTITUTION

101.   Bizzell restates the above paragraphs as if fully set forth herein.

102.   As detailed above, Tripwire fraudulently induced Bizzell to enter into valid, binding, and enforceable contracts, the essential terms of which include Tripwire providing Bizzell 41,407 lbs. of Comp-B, 95,000 lbs. of black powder, and 95,920 lbs. of M6 powder in exchange for payments of $910,954; $1,185,000; and $1,966,360, respectively, from Bizzell.

103.   Accordingly, Bizzell paid Tripwire $910,954 for Comp-B, $1,025,000 for black powder, and $1,966,360 for M6 powder.  Tripwire received and acknowledged Bizzell's payments.

104.   As a result of Tripwire's fraud, and as an alternative to enforcing the contracts, Bizzell is entitled to formal rescission of its contract with Tripwire, along with restitution and all remedies necessary to restore Bizzell as nearly possible to its *status quo ante* prior to Tripwire's fraud, including but not limited to the return of its $3,902,314, interest, and its attorney's fees.

## COUNT VII

## UNJUST ENRICHMENT

105.   Bizzell restates the above paragraphs as if fully set forth herein.

106.   In the alternative to the breach of contract and rescission set forth above, Tripwire has been unjustly enriched by accepting and keeping Bizzell's funds.

107.   Bizzell conferred a benefit on Tripwire by providing payment of $3,902,314 (albeit fraudulently induced).

108.   Tripwire accepted, understood, and appreciated the benefit that Bizzell conferred on it, as evidenced by Tripwire stamping "PAID" on the invoices.

109.   Tripwire has retained Bizzell's payments of $3,902,314, despite knowing that it has not delivered the goods to Bizzell or providing anything else of value to Bizzell.  It would be unjust and inequitable for Tripwire to retain Bizzell's $3,902,314.

110.   Accordingly, Bizzell seeks the return of its $3,902,314 from Tripwire, as equity demands.

## **PRAYER FOR RELIEF**

WHEREFORE, Bizzell respectfully prays that this Court:

A.     Enter judgment in its favor against Defendants in an amount to be proven at trial, but in any event, an amount in excess of $75,000, plus punitive damages in an amount not less than $250,000, plus costs, interest, attorney's fees, and for such and other relief as the Court deems just and proper; and

B.     Additionally, in the event judgment is awarded to Bizzell on its claim for rescission and restitution, Bizzell also seeks an order from Court declaring that the contracts between Bizzell and Tripwire have been rescinded.

Respectfully submitted,

SPILMAN THOMAS & BATTLE, PLLC

Dated: <u>April 16, 2025</u>          By: <u>/s/ Julian E. Neiser</u>
Julian E. Neiser
Pa. Id. No. 87306

Thomas W. Corbett, Jr.
Pa. Id. No. 22809
*Pro Hac Vice* Admission
Forthcoming

One Oxford Centre, Suite 3440
301 Grant Street
Pittsburgh, PA  15219

T:  (412) 325-1116
F:  (412) 325-3324
E:  jneiser@spilmanlaw.com

30

FLUET

Nicolas Rotsko
NY Id. No. 4964169
*Pro Hac Vice* Admission
Forthcoming

1751 Pinnacle Drive, Suite 1000
Tysons, VA  22102

T:  (703) 590-1234
F:  (703) 590-0366
E:  nrotsko@fluet.law

**Attorneys for Plaintiff Bizzell Corporation**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BIZZELL CORPORATION,                         CIVIL ACTION

                              Plaintiff,     No.

                    v.

TRIPWIRE SOUTH, LLC,
TRIPWIRE AVIATION LLC, and
RYAN MORRIS,

                         Defendants.

## **VERIFICATION**

I, Michael Hrobuchak, verify that I am the Chief Executive Officer of Bizzell Corporation ("Bizzell") and that I am authorized to execute this Verification on Bizzell's behalf. Having read the foregoing Verified Complaint, I verify that the statements therein are based on information of which I have personal knowledge or that I have gathered from and confirmed with other agents of Bizzell. While the language of the pleading is that of counsel, I verify that the averments contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief.

I understand that this Verification is made subject to the penalties relating to unsworn falsification to authorities, 28 U.S.C. § 1746.

Dated: <u>April 16, 2025</u>                    <u>/s/ Michael Hrobuchak</u>