# Exhibit "2"

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Middle District of Pennsylvania

| | |
|---|---|
| BIZZELL CORPORATION, | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   1:25-cv-00680 |
| TRIPWIRE SOUTH LLC, TRIPWIRE AVIATION LLC, and RYAN MORRIS, | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Acuity-Janus Global, LLC -- Attention:  Mark Atherton
10701 Parkridge Boulevard, Suite 200, Reston, Virginia 20191-4359

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Exhibit A.

| Place: Spilman Thomas & Battle, PLLC, One Oxford Centre, Suite 3440, 301 Grant Street, Pittsburgh, PA  15219; Documents to be submitted to jneiser@spilmanlaw.com and nrotsko@fluet.law. | Date and Time: 06/27/2025 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    05/28/2025

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| | | /s/ Julian E. Neiser, Esquire |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Plaintiff
Bizzell Corporation                                      , who issues or requests this subpoena, are:
Julian E. Neiser, Esquire, Spilman Thomas & Battle, PLLC, One Oxford Centre, Suite 3440, 301 Grant Street, Pittsburgh, Pa  15219 jneiser@spilmanlaw.com (412) 325-1116

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:25-cv-00680

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**Exhibit "A"**
**Attachment to Subpoena for Documents**

## REQUEST FOR PRODUCTION OF DOCUMENTS

AND NOW COMES Plaintiff Bizzell Corporation ("Bizzell"), and hereby propounds the following First Set of Requests for Production of Documents, by and through its undersigned counsel Spilman Thomas & Battle, PLLC, Julian E. Neiser, Esquire and Thomas W. Corbett, Jr., Esquire, and requests that Acuity-Janus Global, LLC, Attention Legal Department, 10701 Parkridge Boulevard, Suite 200, Reston, Virginia 20191-4359 ("Acuity-Janus Global") respond separately, in writing, and under oath, to the following requests for production of documents, and that service of such responses be made upon the undersigned within 30 days after service or by June 27, 2025 at 10:00 a.m.  All documents may be produced electronically via email to jneiser@spilmanlaw.com and nrotsko@fluet.law.

## DEFINITIONS

A.     All definitions herein are to be given the broadest possible meaning under the Federal Rules of Civil Procedure.

B.     **"Verified Complaint"** or **"Complaint"** or **"Exhibit 1"** means the complaint that was filed with the United States District Court for the Middle

District of Pennsylvania at docket no. 1:25-cv-00680 on April 17, 2025. A copy of the Complaint is attached hereto as **Exhibit 1**.

C. **"Bizzell"** shall refer to Plaintiff Bizzell Corporation, and any person, agent, or entity acting, or purporting to act, on its behalf.

D. "**Tripwire**" shall refer to the Tripwire Group of Companies, to include Defendant Tripwire South and Defendant Tripwire Aviation, and their owners, officers, employees, agents, affiliates etc. acting or purporting to act at Tripwire's request, on its behalf, or under its direction or control.

E. **"Tripwire South"** or **"Tripwire"** shall refer to Defendant Tripwire South, LLC and any person, agent, or entity acting, or purporting to act, on its behalf.

F. **"Tripwire Aviation"** shall refer to Defendant Tripwire Aviation LLC and any person, agent, or entity acting, or purporting to act, on its behalf.

G. **"Ryan Morris"** or **"Morris"** shall refer to Defendant Ryan Morris and as the Owner and Founder of the Tripwire Group of Companies to include Tripwire South and Tripwire Aviation, and any person, agent, or entity acting, or purporting to act, on their behalf.

H. "**Any**" shall be understood to encompass "**all**."

I. The conjunction "**and**" shall include the disjunctive "**or**" and vice versa.

J.      "**Person**" shall mean any natural person or business organization.

K.      "**Document**" or "**documents**" shall have the full meaning as set forth in the Federal Rules of Civil Procedure and includes, but is not limited to, all electronically stored, written, typewritten, handwritten, recorded or printed matter of any kind, including the originals and all non–identical copies thereof, whether different from the originals by reason of any notation made on such copies or otherwise, including without limitation: minutes and/or other records of meetings, agendas, bills, contracts, leases, assignments, agreements, contracts, summaries of negotiations, account books, orders, invoices, statements, bills, checks, accounting records, vouchers, summaries, diaries, forecasts, studies, drawings, graphs, charts, reports and/or summaries of investigations or reports, strategic or business plans or summaries, brochures, pamphlets, publications, circulars, advertisements, trade letters, press releases, statements of policy, correspondence, letters, electronic mail, telegrams, interoffice and intraoffice communications, offers, notations of any sort of conversations, appointment books or calendars, teletypes, telefax, thermafax, confirmations, computer files, printouts of computer files, computer data (including information or programs stored in a computer, whether or not ever printed out or displayed); all drafts, alterations, modifications, changes and amendments of any of the foregoing; all graphic or manual records or representations of any kind, including without limitation, photographs,

3

microfiche, microfilm, video tape, records, motion pictures, and electronic, mechanical or electric records or representations of any kind, including without limitation, tapes, cassettes, disks, magnetic cards, and recordings; and all other similar material which is in your possession, custody or control. Without limiting the term "control" as used in the preceding sentence, a document shall be deemed to be within your control, regardless of its physical location, if you have the right to secure the document or a copy thereof from another person or entity, either public or private, including, but not limited to, your legal counsel, having actual possession thereof.

L.      "**All documents**" shall mean every document, whether an original or copy, as above defined, and every such document or writing which can be located or discovered by reasonably diligent efforts.

M.      "**Refer**," "**relate**," "**reflect**," "**regard**," "**refer to**," "**relate to**," "**relating to**," and "**concerning**," or any other form thereof, shall mean directly or indirectly, in whole or in part, connected with, commenting on, relevant to, impinging or impacting upon, affecting, responding to, showing, describing, representing, supporting, contradicting, stating, mentioning, showing, evaluating, recording, noting, analyzing, or constituting.

N.      "**Identify**" and "**identification**" shall mean, when used in reference to:

4

(a)     <u>A natural person</u>: his or her full name; home address; business address; home and business telephone number; present or last known position, job description, and the identity of his or her business affiliation; his or her position, job description, and the identity of his or her business affiliation at the time and in the context in which he or she is identified; and the relationship, business or otherwise, between such person and yourself.

(b)     <u>A company, corporation, association, partnership, or legal entity other than a natural person</u>: its full name; a description of the type of organization or entity; the address and telephone number of its principal place of business; the jurisdiction of incorporation or organization; the date of its incorporation or organization; and the identity of each natural person acting on behalf of the entity at the time and in the context in which the entity is identified.

(c)     <u>A document</u>: its description (i.e., letter, memorandum, report, etc.); its title; its date; the number of pages thereof; its subject matter; the identity of its author(s), creator(s), originator(s), signer(s), and any person(s) who participated in its preparation; the identity of its addressee(s) or recipient(s); the identity of each person to whom copies were sent and each person by whom copies were received; its present location; and the identity of its custodian(s). If any such document was, but is no longer in your possession or control, state what disposition was made of it and when.

(d)     <u>A communication</u>: the type and/or mode of the communication; the date and time when it occurred; the place where it occurred; the complete substance of the communication; the identity of each person to whom such communication was made, by whom such communication was made, and who was present when such communication was made; and the identity of all documents memorializing, referring, or relating in any way to the communication or its subject matter.

(e)     <u>An assertive action</u>: the date and time when it occurred; the place where it occurred; a detailed description of the action; the identity of each person taking and/or witnessing such action; and the identity of all documents memorializing, referring, or relating in any way to the subject matter of the action.

## INSTRUCTIONS

1.      Each part and sub-part of each discovery request should be answered with the same completeness and effect as though each part and sub-part were the subject of, and were asked by, a separate discovery request.  When a discovery request relates to more than one Person or subject, the discovery request shall be answered as to each Person or subject separately.

2.      You are to furnish all information available to You as of the date of Your responses to these discovery requests, including any information obtained by or in the possession of Your attorneys, representatives, employees or agents, and not merely the information within Your own knowledge or possession.

3.      These requests for production of documents are continuing in nature and require you to file supplementary responses thereto, in accordance with Rule 33 of the Federal Rules of Civil Procedure, if you obtain additional relevant information after the date of your initial answers.

4.      If, after exercising due diligence to obtain the information necessary to provide a full and complete answer, You are unable to answer any discovery request fully and completely, You shall so state, and answer each such discovery request to the fullest extent possible, and in such answer You shall specify the extent of Your knowledge and inability to answer the remainder, and set forth any

information or knowledge You have that relates to the unanswered portions thereof and any efforts You made to obtain the information requested.

5.    These discovery requests shall be construed to make the discovery requests inclusive rather than exclusive.  For example, the past tense shall be construed to include the present tense, and vice versa; the singular shall include the plural, and vice versa; "and" and "or" shall be construed both conjunctively and disjunctively; and "any" or "each" shall mean "each and every" as well as "any one."  The singular form of a noun or pronoun includes the plural form of the noun or pronoun so used, and vice versa; and the use of any tense of any verb includes all other tenses of the verb so used.

6.    If you do not produce any document responsive to these discovery requests because you assert a claim of privilege or for any other reason, state the basis for withholding the document and identify it.  In addition, provide the name, address and phone number of each person (1) to whom the contents of the document have already been revealed; and (2) now in possession or control of the document or copies thereof.

7.    Unless otherwise indicated, these requests for production of documents refer to the time, place, and circumstances referred to in the Complaint.

8.    Each request for production of documents is to be answered separately and as completely as possible.  The fact that an investigation is continuing or that

discovery is not complete shall not be used as an excuse for failure to respond to each request as fully as possible.  The omission of any name, fact, or other item of information from the answer shall be deemed a representation that such name, fact, or item was not known to Acuity-Janus Global LLC, counsel, or other representatives at the time of service of the answer/response.

9.     The above definitions apply whether the definition has been capitalized or not.

10.     For each request for production, identify in each response the corresponding Bates Number range of documents You are producing.

11.     These requests for production of documents are propounded in connection with civil action proceedings and Bizzell reserves all rights to propound additional requests later in this case that will not be limited in number or scope as a result of these requests.

**<u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>**

1.     Documents and communications concerning the U.S. Government's initial refusal to authorize use of the "Steam-Out, Hot-Gas, Inert-Demil" process ("Steam-Out" or "melting" process) to demilitarize the 561 Walleye warheads at Hawthorne Army Depot ("HWAD") referenced in the Acuity-Janus LLC letter dated May 15, 2024 (from JoAnne Lawonn to Christine Cissa of Amentum

Services, Inc.), attached hereto as **Exhibit 2**, at 1 ("561 warheads currently awaiting steam-out").

**Response:**

2.      Documents and communications explaining why the remote saw method was proposed for demilitarizing the 561 Walleye warheads at HWAD, as reflected in the Acuity-Janus LLC letter dated May 15, 2024 (from JoAnne Lawonn to Christine Cissa of Amentum Services, Inc.), attached hereto as **Exhibit 2**.

**Response:**

3.      Documents and communications sufficient to establish the date in 2024 when the U.S. Government approved the remote saw method to demilitarize the 561 Walleye warheads at HWAD referenced in **Exhibit 2**.

**Response:**

4.      Documents and communications sufficient to establish the date in 2024 when the U.S. Government authorized the use of the Steam-Out or melting process to demilitarize the 561 Walleye warheads at HWAD referenced in **Exhibit 2**.

**Response:**

5.     Documents and communications sufficient to establish the date when demilitarization of the explosive material in the 561 Walleye warheads referenced in **Exhibit 2** was first commenced.

**Response:**

6.     Documents and communications sufficient to establish the date when Composition B from demilitarized Walleye warheads referenced in **Exhibit 2** was first available to be delivered to buyers.

**Response:**

7.     Documents and communications (including but not limited to any to Bonetti) indicating that the U.S. Government had not authorized demilitarization of the Walleye warheads at HWAD (referenced in **Exhibit 2**) during May-August 2024.

**Response:**

8.     Documents and communications concerning any sales of Comp-B to Tripwire prior to February 21, 2025.

**Response:**

9.     Documents and communications discussing, reacting to, or responding to telephone call(s) from Bizzell's CEO Michael Hrobuchak to HWAD, Acuity, or Bonetti in July 2024. During these telephone call(s), Mr. Hrobuchak

advised that Bizzell had paid Tripwire for a test shipment of Comp-B and trucks were ready to pick up Bizzell's Comp-B order at HWAD.

**Response:**


10.    Documents and communications concerning any contract between Bizzell and Tripwire for the purchase of demilitarized Comp-B.

**Response:**

# Exhibit "1"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BIZZELL CORPORATION                          CIVIL ACTION
1712 Pioneer, Suite 135
Cheyenne, WY  82001,                         No.

                    Plaintiff,

            v.

TRIPWIRE SOUTH, LLC
1475 Highland Avenue Road
Gettysburg, PA  17325,

TRIPWIRE AVIATION LLC
1475 Highland Avenue Road
Gettysburg, PA  17325,

RYAN MORRIS
1425 Knoxlyn-Orrtanna Road
Orrtanna, PA  17353,

                    Defendants.

## **VERIFIED COMPLAINT**

Plaintiff Bizzell Corporation ("Bizzell" or "Plaintiff") by and through its

undersigned counsel, files this Verified Complaint against Defendants Tripwire

South, LLC ("Tripwire South" or "Tripwire"), Tripwire Aviation LLC ("Tripwire

Aviation") and Ryan Morris ("Morris") (together, "Defendants") and avers as

follows:

**NATURE OF CASE**

1.      This case is about fraud perpetrated by a local businessman, part-time Liberty Township police officer, and Gettysburg Area School District school board member in a deal for more than 230,000 lbs. of high explosives and accelerant powders, which were to be used for artillery shells to support the war efforts of our embattled allies Ukraine and Israel during their time of dire need.  Plaintiff Bizzell Corporation paid $3.9 million to Defendants Ryan Morris and his entity Tripwire South, LLC, but he defrauded Bizzell and failed to deliver any of what was promised.

2.      Morris lied about having high explosives available to sell, and even provided false photographs and Safety Data Sheets, all to induce Bizzell to pay immediately (just shy of $1 million).  Morris had no high explosives to deliver, but kept Bizzell's money anyway.  And Bizzell paid $2.9 million for the accelerant powders, but instead of delivering them to Bizzell, Morris sold them to an Eastern European buyer at a higher price, again without returning Bizzell's money.

3.      While he should have returned Bizzell's $3.9 million, Morris apparently used the funds to purchase multiple helicopters, real estate, numerous Rolexes, and otherwise enjoy a lavish, unearned lifestyle, during and after declaring personal bankruptcy.

2

4.      Morris's fraud, deceit, and breaches of contract undermined Bizzell's efforts to support U.S. allies during a period of intense international conflict and tension, solely to pad his own pockets with ill-gotten funds.  The millions fraudulently taken from Bizzell must be returned, and Bizzell must be compensated for the cost of procuring this materiel from other suppliers at the prevailing higher prices.

## **INTRODUCTION**

5.      Plaintiff Bizzell entered into several contracts with Defendant Tripwire in April and June 2024.  Bizzell fulfilled its obligations, paying Tripwire not less than $3.9 million for (a) 41,000 lbs. of the high explosive Composition B ("Comp-B"), and (b) 190,000 lbs. of accelerant powders.  Tripwire failed to deliver any of it.

6.      The Comp-B was a key input for artillery shells destined for the Ukrainian Ministry of Defense, at a time when Russia was firing more than 10,000 shells a day on the Ukrainians, and when Russian munitions production could sustain an even greater rate of daily shelling.  By contrast, Ukraine could sustain a rate of fire of only about 2,000 shells per day, and its Western allies were working feverishly to expand shell production capacity.  Bizzell's contract with Tripwire for Comp-B was part of this effort to help Ukraine achieve parity.

7.      The accelerant powders were to be used for munitions for the Israel Defense Forces ("IDF"), at a time when they were fending off rocket barrages from Iran and engaged in combat against Iran's proxies on multiple fronts.  After months of heavy combat in Gaza, the IDF was facing increased pressure from Hezbollah in Lebanon and urgently needed to replenish munitions.  Bizzell's contracts with Tripwire for powders were part of this effort.

8.      Bizzell paid $3.9 million to Tripwire only because of the fraud and deceit of Tripwire's President and owner, Ryan Morris.  Morris lied about having Comp-B to sell, and provided fraudulent photographs to convince Bizzell it was almost ready for shipment.  Morris lied that he needed Bizzell's immediate payment for the Comp-B.  He said he already signed a contract with the U.S. Government to obtain the Comp-B, and needed to pay.  Morris lied about entering into a separate contract with a vendor to process the Comp-B into flake for Bizzell, all to induce Bizzell to quickly transfer the funds for the first order of 41,000 lbs., while at the same time trying to convince Bizzell to pay for another 160,000 lbs. (at an additional cost of $4 million).  The truth was that Morris had no Comp-B to sell, and no ability to obtain it.

9.      Morris similarly lied about the powders.  First, he falsely invoiced Bizzell for more than $7 million worth of powders that Bizzell never ordered (but expressly rejected).  And later, he lied about the powders Bizzell actually ordered,

claiming they were being held in Tripwire's Gettysburg facility until Bizzell could facilitate shipment, when in fact he sold them to a different buyer in Eastern Europe at a higher price.

10.    As if these fraudulent business practices were not bad enough, Morris somehow believes he gets to keep the $3.9 million Bizzell paid, despite never delivering anything in return.

11.    And it gets worse.  After taking Bizzell's payments, Morris began to splurge on an opulent personal lifestyle, buying Rolexes for himself and key employees, while simultaneously claiming in his personal bankruptcy (commenced in October 2024, Case No. 1:24-bk-02535 (Bankr. M.D. Pa.), Van Eck, J.) to earn only about $5,000 per month as Tripwire's President.  Morris failed to disclose to the Bankruptcy Court *any* ownership interest in Tripwire South.  Instead, he conveniently disclosed an ownership interest only in a defunct, bankrupt business entity that he previously used for carrying on Tripwire's business, which owed millions to creditors with no apparent revenue streams.  He concealed his ownership interest in Tripwire South, which was flush with cash fraudulently taken from Bizzell.

12.    Further, in his personal bankruptcy proceeding, Morris reported that his then-fiancée's income was also $5,000/month, for a combined household income of $10,000/month, with reported expenses of about $11,000/month.  While

he represented to the Bankruptcy Court that they could not cover their monthly expenses, they were deep into planning their June 2025 wedding at one of Ireland's most expensive, Five-Star luxury wedding hotels, the Mount Juliet Estate in County Kilkenny, which carries a steep price tag. The RSVP deadline was five days before Morris's personal bankruptcy case closed. Where the money for such a costly, over-the-top wedding came from is a mystery only this case can unravel. Upon information and belief, the funds were stolen from Bizzell.

13. Further, upon information and belief, Morris has attempted to hide funds stolen from Bizzell by transferring them to third-parties, including new business entities he set up. For instance, in July 2024, just after taking Bizzell's payment for Comp-B that Morris knew he did not have to sell, Morris formed a new subsidiary, Tripwire Aviation LLC. After taking $3.9 million from Bizzell, the newly formed Tripwire Aviation suddenly purchased multiple helicopters, including an MD500D at a cost of $1 million, and installed $350,000 in optical equipment on the helicopter, despite not having any paying customers.

14. Tripwire Aviation co-owner Michael Dickerson, who is also the Gettysburg Area School Board Vice President, bragged to the media at a recent public relations event—where Tripwire gave local municipal and County officials free rides in the helicopter—that the MD500D is akin to a "Ferrari."

6

15.     Tripwire Aviation then purchased a Hughes/Schweizer 269C helicopter, again without any apparent revenue streams (other than funds pilfered from Bizzell).

16.     And Morris has attempted to launder funds taken from Bizzell through related-party real estate transactions.  In February 2025, for instance, he caused Tripwire (flush after defrauding Bizzell) to pay him $416,000 for his old granite quarry property adjacent to Tripwire's headquarters in Gettysburg, where he is now building helicopter pads for Tripwire Aviation (again without Tripwire Aviation having any apparent legitimate revenue streams from which to make such capital investments).

17.     Morris holds Tripwire out as a federal defense contractor and active participant in the military supply chain.  Tripwire claims to be a key subcontractor, along with Astor Defense, supporting Global Ordnance LLC dba Global Military Products' $450 million Department of Defense contract for TNT.  Tripwire also claims to be a key subcontractor providing drone warheads for Department of Defense contracts.  Tripwire's brazen fraud in its dealings with Bizzell would appear to be all the more surprising, therefore, given the severe consequences with which fraud is punished in federal contractor suspension and debarment proceedings.

18.     Yet Morris's business history reveals that Bizzell is not the first customer he has defrauded using the same playbook.  The Republic of Qatar, for example, obtained a civil fraud judgment against the previous entity Morris used to carry on Tripwire's business, after Morris took the Qatari's payments, but then failed to deliver the explosive products, after stringing the Qataris along for more than a year with promises that the shipment would soon be on its way.  Upon information and belief, there are multiple other examples of similar fraud, with victims ranging from Morris's former business partners, to U.S. based defense contractors and intermediaries, to NATO ally defense contractors, and even Florida police departments.

19.     Further, Morris's business history reveals that his habit of using corporate assets to fund his personal lifestyle is not new either.  For example, when he commenced a bankruptcy proceeding for the entity he previously used to conduct Tripwire business, the 90-day look-back disclosures revealed that he used company assets to pay for his personal vehicle, personal tractor, and testosterone injections.

20.     Morris continued this fraudulent pattern in his dealings with Bizzell. He and his Tripwire Group have not only taken millions of dollars from Bizzell and severely damaged its business, but they also delayed and undermined delivery of mission-critical munitions to United States' embattled allies.

## **PARTIES**

21.    Bizzell Corporation is a certified Veteran Owned and Service-Disabled Veteran Owned Small Business ("SDVOSB"), incorporated under the laws of Wyoming, headquartered in Cheyenne, Wyoming.  Bizzell is a defense contractor to the U.S. Government and NATO allies.  Bizzell provides intelligence, logistics, training, and contingency operations services to its customers.  Bizzell also produces munitions in its own factories and facilitates the military supply chain of allies, including delivery of much needed shells for the Ukrainian Army, and explosive powders to IDF munitions contractors.

22.    Ryan J. Morris is the President and controlling owner of Tripwire South and Tripwire Aviation.  Morris owns and controls a number of alter-egos sharing the Tripwire name, including Tripwire South and Tripwire Aviation, which collectively form the Tripwire Group.  Morris resides at 1425 Knoxlyn-Orrtanna Rd, Orrtanna, PA 17353.  Morris is a member of the Gettysburg Area School District School Board, and also a part-time sergeant with the Liberty Township Police Department.  Morris is sued in his personal capacity only.

23.    Tripwire South, LLC is a limited liability company formed under the laws of the state of Florida, with its principal place of business in Gettysburg, Pennsylvania.  Kenneth Hassinger, President of the Gettysburg Area School District Board of Education, joined Tripwire South in or around October 2024.

When Tripwire South's articles of organization were filed in April 2021, its members consisted of Morris, a Pennsylvania citizen; Charles Arant, a Florida citizen; Susan Boully, a Florida citizen; Ashley DeLauter (Morris's wife), a Pennsylvania citizen; and Josh Mills (Tripwire South's Chief Operating Officer), a Pennsylvania citizen.  As of February 2022, Tripwire South's disclosed membership consisted of Morris (Pennsylvania); Arant (Florida); and Boully (Florida).  Upon information and belief, no member of Tripwire South is a citizen of Wyoming.

24.    Tripwire Aviation LLC is a limited liability company formed in July 2024 under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Gettysburg, Pennsylvania.  Tripwire Aviation is a new addition to Morris's Tripwire Group, which Morris controls.  Michael Dickerson, the Gettysburg Area School District Board of Education Vice President, is also a member of Tripwire Aviation, and its Chief Operating Officer.  Upon information and belief, no member of Tripwire Aviation is a citizen of Wyoming.

### JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).  Bizzell is a citizen of Wyoming.  Tripwire South is a limited liability company whose ultimate membership, upon information and belief, consists of Pennsylvania and Florida citizens.  Tripwire Aviation is a limited

liability company whose ultimate membership, upon information and belief, consists of Pennsylvania citizens, including Morris and Dickerson.  Upon information and belief, no member of Tripwire South nor Tripwire Aviation is a citizen of Wyoming, so complete diversity of citizenship exists here.

26.    The amount in controversy exceeds $75,000.

27.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), -(b)(2), and -(c)(2), because Morris, Tripwire South, and Tripwire Aviation reside in the Middle District of Pennsylvania.  Moreover, a substantial part of the events or omissions giving rise to Bizzell's claims occurred in the Middle District of Pennsylvania and a substantial part of property involved is situated therein.

## FACTS

### I.    Morris defrauded Bizzell out of $910,954 it paid for Comp-B.

28.    In May 2024, Bizzell and Morris began discussions about Bizzell's need for a sizeable quantity of Comp-B.  Comp-B is a high explosive, comprised of RDX and TNT, and is the main explosive in artillery shells, rockets, land mines, and hand grenades.  Bizzell needed Comp-B to supply artillery shells destined for Ukraine.

29.    In early June 2024, Morris represented to Bizzell that Tripwire could sell approximately 200,000 lbs. of Comp-B that had purportedly been demilitarized ("demilled") at the Hawthorne Army Depot ("HWAD") in Hawthorne, Nevada.

("Demilled" here means to remove the Comp-B from unfired rockets, as aging stockpiles are eliminated, so the explosives can be used in new munitions.)

30.    Bizzell expressed interest in the Comp-B.  Tripwire assured Bizzell that if Bizzell purchased the Comp-B, it would just need to be repacked.

31.    To close the sale, Morris promised to have the Comp-B "flaked" into smaller pieces.  Morris and Tripwire knew that Bizzell intended to use the Comp-B for artillery shells and assumed that flaking rocket-sized Comp-B cylinders into smaller chunks for recasting into shells would be attractive to Bizzell.  Morris even assured Bizzell that Tripwire had signed an agreement to have the Comp-B flaked.

32.    On June 5, 2024, to prove that the Comp-B was available for sale, upon Bizzell's request, Morris provided multiple photos, purportedly of the Comp-B Tripwire had available.



Attached hereto as **Exhibit A**, which is incorporated herein by reference, are true and correct copies of additional photos provided by Morris.

33. Also, upon Bizzell's request, Morris provided Safety Data Sheets, again purportedly for Tripwire's Comp-B. Attached hereto as **Exhibit B**, which is incorporated herein by reference, are true and correct copies of records that include one of the Safety Data Sheets.

34. On or about June 7, 2024, Bizzell ordered **41,407 lbs.** of Comp-B. The same day, Tripwire issued Invoice No. 1629, for a total price of **$910,954**. Attached hereto as **Exhibit C**, which is incorporated herein by reference, is a true and correct copy of Invoice No. 1629, stamped "PAID."

35. Bizzell wired $910,954 to Tripwire on June 7, 2024, in full payment of Invoice No. 1629. Attached hereto as **Exhibit D**, which is incorporated herein by reference, is a true and accurate copy of the wire transaction confirmation; *see also* Ex. C.

36. Prior to and after receiving Bizzell's payment on June 7, Morris repeatedly assured Bizzell that delivery of the Comp-B would be made within 20 days. For example, on June 14 and 15, 2024, Morris assured Bizzell that the Comp-B was at HWAD and would be ready in 14 days.

37. Despite Morris's assurances that the Comp-B would be available for delivery within 20 days, and despite Bizzell's full payment, to date Tripwire has

13

failed to deliver.  Bizzell received no Comp-B from Tripwire whatsoever, despite paying Tripwire nearly $1 million.

38.    Bizzell attempted to cancel the contract for Comp-B on July 12, 2024, and obtain a refund from Tripwire, but Tripwire refused to return a penny of Bizzell's $910,954.

39.    Bizzell learned that Morris engaged in fraudulent misrepresentations throughout the sales process.  Despite Morris's repeated assertions regarding the Comp-B being ready for delivery, Bizzell discovered that Morris and Tripwire never had access to—or the ability to sell—demilled Comp-B from HWAD.  The Army had not yet authorized its sale to private parties.  Bizzell learned that the Comp-B Tripwire took payment for had not even been demilled, and that Tripwire had no rights in the Comp-B to sell.

40.    Morris's continued assurances of delivery within 20 days, his photos of the purported Comp-B, his Safety Data Sheets, and his promises that the Comp-B was in the process of being flaked for Bizzell, were fraudulent.

41.    In the wake of Tripwire's failure to deliver the Comp-B, Bizzell was forced to scramble and devote considerable time and resources to locating alternative supply to fulfill its contract for artillery shells destined for Ukraine.

42.    Bizzell continues to search for a replacement supply of Comp-B, but has not located a source.  Tripwire is liable for the difference between its price and

what Bizzell will ultimately pay to a replacement source, in addition to returning Bizzell's payment.

**II.    Morris defrauded Bizzell out of $2,991,360 it paid for Black and M6 Powders.**

43.    In April 2024, Bizzell conveyed to Tripwire that it was in the market to purchase accelerant powders, and was interested to learn whether Tripwire had any for sale.  Morris responded that Tripwire could sell M1, M6, M26, M30, and black powders.  Bizzell made clear that it would only place orders for powders that passed testing and inspection as a precondition, as is customary in the industry.

44.    During this typical pre-sale due diligence phase, Bizzell declined to order the M1, M26, and M30 powders because they failed inspection.  Bizzell discovered that these powders dated from the 1960s (or had other flaws), which Morris attempted to conceal.

45.    Bizzell agreed to purchase **75,000 lbs.** of black powder from Tripwire. Tripwire sent Invoice No. 1598 for a total cost of **$1,025,000** for the black powder. Attached here to as **Exhibit E**, which is incorporated herein by reference, is a true and correct copy of Invoice No. 1598.  Bizzell paid the invoice in full.  Attached hereto as **Exhibit F**, which is incorporated herein by reference, is a true and correct copy of the payment confirmation.

46.    Bizzell also agreed to purchase **95,920 lbs.** of M6 High Explosive powder from Tripwire.  Tripwire sent Bizzell Invoice No. 1631 for a total cost of

15

**$1,966,360** for the M6 powder.  Attached hereto as **Exhibit G**, which is incorporated herein by reference, is a true and correct copy of Invoice No. 1631.

47.    On June 15, Morris texted Bizzell, representing that the "M powders" were in North Carolina and West Virginia and that the black powder was in Gettysburg.  Two days later, relying on Morris's representations, Bizzell paid the **$1,966,360** M6 powder invoice in full.  Attached hereto is **Exhibit H**, which is incorporated herein by reference, which demonstrates a proof of payment.

48.    In September 2024, Tripwire personnel conveyed that the powders Bizzell had purchased were packaged and ready for pickup in Gettysburg.  Morris assured Bizzell that the powders would be delivered.

49.    Tripwire, Bizzell, and Bizzell's logistics agent corresponded regularly in the weeks that followed as the parties obtained export licenses, inspection certificates, and worked on other details to prepare for international shipment of the powders.

50.    When Bizzell provided the final license Tripwire requested, which the parties understood was the last step before shipment, Morris cut off all communications with Bizzell.  Despite taking Bizzell's payments and stringing Bizzell along in a lengthy process of arranging shipment, Tripwire failed to deliver any of the powders.

51.    Bizzell subsequently learned that in or around November 2024, Tripwire sold the powders to an Eastern European company at higher price, after Bizzell already paid for the same goods.

52.    Bizzell has received no black powder or M6 powder from Tripwire, despite paying nearly $3 million, which must be returned.

53.     In the wake of Tripwire's failure to deliver the powders, Bizzell was forced to scramble and devote considerable time and resources to locating alternative supply to fulfill its contract with an Israeli defense company that needs the powders for IDF munitions.

54.    Although Bizzell has been able to locate at least a partial replacement supply of the black powder, the price per pound for the replacement supply is 15%–25% higher than what Bizzell paid Tripwire.  Tripwire is liable for the difference, in addition to returning Bizzell's payment.  Despite its best efforts, Bizzell has not been able to locate any replacement supply for the M6 powder, but continues its search, and Tripwire will be liable for the difference once a replacement source is found.

### III.    Morris diverted Bizzell's payments to himself and other Tripwire Group companies, instead of returning them to Bizzell.

55.    Morris defrauded Bizzell on behalf of and through Tripwire, caused Tripwire to breach its agreements with Bizzell, then attempted to use the fictitious liability shield of his Tripwire Group to complete his fraud and evade

17

responsibility.  Tripwire South and Tripwire Aviation constitute little more than legal fictions and are Morris's alter egos.

56.    Upon information and belief, Tripwire Aviation, set up by Morris and Dickerson just after receipt of Bizzell's sizeable payments that Morris never intended to return, used Bizzell's money to purchase at least one MD500D helicopter, which Dickerson boasted is akin to a "Ferrari," with an estimated operational cost of nearly $600 per hour, a purchase price of $1 million, and an additional $350,000 of optical equipment.  Upon information and belief, Tripwire Aviation has also used Bizzell's money to purchase one or more additional helicopters, including a Hughes/Schweizer 269C.

57.    In addition to marketing itself as a purveyor of helicopter-borne training for first responders, Tripwire Aviation has publicized its intention to make its MD500D and 269C available to municipal entities in Adams County, Pennsylvania, including the Liberty Township Police Department, where Morris is a part time law enforcement officer.  Morris has expressed his intention to acquire a "fleet" of helicopters, portending further outlays of Bizzell's money and complicating Bizzell's efforts to recover its funds before they become irretrievable.

58.    Morris and Dickerson seek a financial and public relations windfall by making the helicopters available to Liberty Township's Public Safety Support Program free of charge, and are pitching Adams County and even the

18

Commonwealth on the prospect of using Tripwire Aviation's helicopters for search and rescue missions. Morris has appeared in numerous news articles on the subject and indicated that he "expects" Liberty Township to help him seek federal grants to cover associated costs of the helicopters.

59. After Tripwire pocketed Bizzell's money, Morris diverted those assets away from Tripwire, and siphoned company funds that he used to purchase multiple Rolex watches, lavish gifts, and capital investment in Tripwire Aviation.

60. Morris has also shown disregard for corporate formalities in his management and ownership of Tripwire and has engaged in significant commingling of Tripwire's assets and his own. In February 2025, Morris engaged in a related-party transaction, selling his real property located at 1800 Baltimore Pike in Gettysburg, Pennsylvania, to Tripwire South for $416,000 and transferring the funds to himself, indicating a lack of respect for the corporate form and for Tripwire as a separate entity.

61. During his Chapter 7 bankruptcy proceeding, which spanned October 2024 to January 2025, Morris informed the U.S. Bankruptcy Court for the Middle District of Pennsylvania that he owned no Rolexes, had little cash, and did not disclose receiving proceeds from the sale of Tripwire assets (or his ownership interest therein), to secure the discharge of his debts. If that were all true, then the posh European destination wedding that Morris and his fiancée were planning

could only have been paid for with Tripwire funds.  Morris, after all, earns $23.92 per hour as a part-time police officer with Liberty Township.  Tripwire is thus a mere façade for the operations of Morris, its principal and dominant member.  He abused his position as Tripwire's controlling owner to divert corporate assets (wrongfully taken from Bizzell) to himself.

62.     As the specific, unusual circumstances of this case demonstrate, the fundamental unfairness of this situation is patent, and injustice would occur if Morris were not made personally responsible for his and Tripwire's transgressions against Bizzell.  Moreover, permitting Morris to shield himself from liability by invoking the corporate form would defeat public policy and encourage fraud.

63.     Bizzell therefore brings this action against Morris, Tripwire South, and Tripwire Aviation to recover the $910,954 it paid for Comp-B and the $2,991,360 it paid for black and M6 powders, which together total $3,902,314, plus the additional cost of replacement supply, and all incidental and consequential damages.

## <u>COUNT I</u>

### **FRAUD**

64.    Bizzell restates the above paragraphs as if fully set forth herein.

65.    Tripwire, through Morris and other agents, made multiple representations to Bizzell regarding Comp-B that Tripwire purportedly had ready for sale to Bizzell, including that:

     a.    Tripwire could sell approximately 41,000 lbs. of Comp-B (indeed 200,000 lbs.) that had already been "demilled" at HWAD in Hawthorne, Nevada;

     b.    Tripwire could make the demilled Comp-B available 20 days after payment because all that was required to deliver it to Bizzell was repacking;

     c.    Tripwire had the Comp-B in its possession or control;

     d.    Tripwire had Safety Data Sheets corresponding to the Comp-B;

     e.    Tripwire could have the Comp-B flaked, which would make it better suited for Bizzell's purposes; and

     f.    Tripwire had signed an agreement to have the Comp-B flaked.

66.    Morris and Tripwire made these representations knowing that they were false.

67. In the alternative, Morris and Tripwire made these representations with reckless disregard for their truth or falsity.

68. Morris and Tripwire made these representations with the intent to mislead Bizzell into believing that Tripwire had Comp-B and M6 and black powder in its possession or control so that Bizzell would enter into contracts with Tripwire to purchase the Comp-B and powders.

69. Bizzell was justified in relying on Morris and Tripwire's false representations, and would not have paid Tripwire but for these lies.

70. Without Morris and Tripwire's false representations, Bizzell would not have entered into contracts with Tripwire to purchase Comp-B and M6 and black powder, nor paid any amounts to Tripwire.

71. Morris and Tripwire continued to make false representations to Bizzell during the months after Bizzell paid for the powders, when the parties were engaged in obtaining export licenses, certifications, and arranging logistics. Tripwire falsely represented that it was preparing to deliver the powders to Bizzell, when in fact it was arranging for the sale of the same powders to a different buyer from Eastern Europe.

72. Bizzell incurred damages as a result of Morris and Tripwire's fraudulent conduct, including but not limited to the loss of the $910,954 Bizzell paid Tripwire for Comp-B and the $2,991,360 it paid Tripwire for M6 and black

22

powder, as well as the cost of obtaining replacement supply at higher prices, as well as further consequential and incidental damages.

73. Bizzell has also suffered substantial reputational damage in its professional community as a direct result of Morris and Tripwire's fraudulent conduct.

74. Morris and Tripwire acted with reckless indifference to Bizzell's rights in their persistent fraudulent deception and their conduct merits further sanctions to achieve punishment and deterrence. Thus, Bizzell is entitled to an award of punitive damages.

## COUNT II

### FRAUDULENT INDUCEMENT

75. Bizzell restates the above paragraphs as if fully set forth herein.

76. Tripwire, through Morris and other agents, made multiple representations to Bizzell regarding Comp-B that Tripwire purportedly had ready for sale to Bizzell, including those recited in ¶ 65 *supra*.

77. Morris and Tripwire made these representations knowing that they were false.

78. In the alternative, Morris and Tripwire made these representations with reckless disregard for their truth or falsity.

79.     Morris and Tripwire made these representations with the intent to mislead Bizzell into believing that Tripwire had Comp-B and M6 and black powder in its possession or control so that Bizzell would enter into contracts with Tripwire to purchase the Comp-B and powders.

80.     Bizzell was justified in relying on Morris and Tripwire's false representations.  Without Morris and Tripwire's representations, Bizzell would not have entered into contracts with Tripwire to purchase Comp-B and M6 and black powder.

81.     Morris and Tripwire's false representations were made with specific intent to induce Bizzell to enter into contracts when Bizzell had no duty to do so.

82.     Bizzell incurred damages as a result of Morris and Tripwire's fraudulent conduct, including but not limited to the loss of the $910,954 Bizzell paid Tripwire for Comp-B and the $2,991,360 it paid Tripwire for M6 and black powder, as well as the cost of obtaining replacement supply at higher prices, as well as further consequential and incidental damages.

83.     Bizzell has also suffered substantial reputational damage in its professional community as a direct result of Morris and Tripwire's fraudulent conduct.

84.     Morris and Tripwire acted with reckless indifference to Bizzell's rights in their persistent fraudulent deception and their conduct merits further

sanctions to achieve punishment and deterrence.  Thus, Bizzell is entitled to an award of punitive damages.

## COUNT III

### BREACH OF CONTRACT (COMP-B)

85.    Bizzell restates the above paragraphs as if fully set forth herein.

86.    Bizzell and Tripwire entered into a valid, binding, and enforceable contract, the essential terms of which included Tripwire delivering to Bizzell 41,407 lbs. of Comp-B in exchange for payment of $910,954 from Bizzell.

87.    Accordingly, Bizzell paid Tripwire $910,954, fulfilling its obligations under the Comp-B contract.  Tripwire received and acknowledged Bizzell's payment.

88.    Tripwire promised to deliver the Comp-B within 20 days, but failed to do so, thereby breaching its contract with Bizzell.

89.    Tripwire thereafter sought to cancel its order and receive its money back.  To date, Tripwire has neither delivered the Comp-B promised under the contract nor returned the $910,954 Bizzell paid Tripwire, thereby breaching the Comp-B contract.

90.    Bizzell has incurred damages as a result of Tripwire's breach, including but not limited to the loss of the $910,954 it paid Tripwire for Comp-B

and the cost of obtaining replacement supply at a higher price, as well as

consequential, incidental, and any other measure of damages under applicable law.

## COUNT IV

## BREACH OF CONTRACT (BLACK POWDER)

91.     Bizzell restates the above paragraphs as if fully set forth herein.

92.     Bizzell and Tripwire entered into a valid, binding, and enforceable

contract, the essential terms of which included Tripwire delivering to Bizzell

75,000 lbs. of black powder in exchange for payment of $1,025,000 from Bizzell.

93.     Accordingly, Bizzell paid Tripwire $1,025,000, fulfilling its

obligations under this contract.  Tripwire received and acknowledged Bizzell's

payment.

94.     To date, Tripwire has neither delivered the black powder promised

under the contract nor returned the $1,025,000 Bizzell paid, thereby breaching the

black powder contract.

95.     Bizzell has incurred damages as a result of Tripwire's breach,

including but not limited to the loss of the $1,025,000 it paid Tripwire for the black

powder and the cost of obtaining replacement supply at a higher price, as well as

consequential, incidental, and any other measure of damages under applicable law.

## COUNT V

### BREACH OF CONTRACT (M6 POWDER)

96.    Bizzell restates the above paragraphs as if fully set forth herein.

97.    Bizzell and Tripwire entered into a valid, binding, and enforceable contract, the essential terms of which included Tripwire delivering to Bizzell 95,920 lbs. of M6 powder in exchange for payment of $1,966,360 from Bizzell.

98.    Accordingly, Bizzell paid Tripwire $1,966,360, fulfilling its obligations under the contract.  Tripwire received and acknowledged Bizzell's payment.

99.    To date, Tripwire has neither delivered the M6 powder promised under the contract nor returned the $1,966,360 Bizzell paid, thereby breaching the M6 contract.

100.    Bizzell has incurred damages as a result of Tripwire's breach, including but not limited to the loss of the $1,966,360 it paid Tripwire for M6 powder and the cost of obtaining replacement supply at a higher price, as well as consequential, incidental, and any other measure of damages under applicable law.

## COUNT VI

### RESCISSION AND RESTITUTION

101.    Bizzell restates the above paragraphs as if fully set forth herein.

27

102. As detailed above, Tripwire fraudulently induced Bizzell to enter into valid, binding, and enforceable contracts, the essential terms of which include Tripwire providing Bizzell 41,407 lbs. of Comp-B, 95,000 lbs. of black powder, and 95,920 lbs. of M6 powder in exchange for payments of $910,954; $1,185,000; and $1,966,360, respectively, from Bizzell.

103. Accordingly, Bizzell paid Tripwire $910,954 for Comp-B, $1,025,000 for black powder, and $1,966,360 for M6 powder. Tripwire received and acknowledged Bizzell's payments.

104. As a result of Tripwire's fraud, and as an alternative to enforcing the contracts, Bizzell is entitled to formal rescission of its contract with Tripwire, along with restitution and all remedies necessary to restore Bizzell as nearly possible to its *status quo ante* prior to Tripwire's fraud, including but not limited to the return of its $3,902,314, interest, and its attorney's fees.

**COUNT VII**

**UNJUST ENRICHMENT**

105. Bizzell restates the above paragraphs as if fully set forth herein.

106. In the alternative to the breach of contract and rescission set forth above, Tripwire has been unjustly enriched by accepting and keeping Bizzell's funds.

107.  Bizzell conferred a benefit on Tripwire by providing payment of $3,902,314 (albeit fraudulently induced).

108.  Tripwire accepted, understood, and appreciated the benefit that Bizzell conferred on it, as evidenced by Tripwire stamping "PAID" on the invoices.

109.  Tripwire has retained Bizzell's payments of $3,902,314, despite knowing that it has not delivered the goods to Bizzell or providing anything else of value to Bizzell.  It would be unjust and inequitable for Tripwire to retain Bizzell's $3,902,314.

110.  Accordingly, Bizzell seeks the return of its $3,902,314 from Tripwire, as equity demands.

## **PRAYER FOR RELIEF**

WHEREFORE, Bizzell respectfully prays that this Court:

A.      Enter judgment in its favor against Defendants in an amount to be proven at trial, but in any event, an amount in excess of $75,000, plus punitive damages in an amount not less than $250,000, plus costs, interest, attorney's fees, and for such and other relief as the Court deems just and proper; and

B.      Additionally, in the event judgment is awarded to Bizzell on its claim for rescission and restitution, Bizzell also seeks an order from Court declaring that the contracts between Bizzell and Tripwire have been rescinded.

Respectfully submitted,

SPILMAN THOMAS & BATTLE, PLLC

Dated: April 16, 2025                    By:  /s/ Julian E. Neiser
                                              Julian E. Neiser
                                              Pa. Id. No. 87306

                                              Thomas W. Corbett, Jr.
                                              Pa. Id. No. 22809
                                              *Pro Hac Vice* Admission
                                              Forthcoming

                                              One Oxford Centre, Suite 3440
                                              301 Grant Street
                                              Pittsburgh, PA  15219

                                              T:  (412) 325-1116
                                              F:  (412) 325-3324
                                              E:  jneiser@spilmanlaw.com

FLUET

Nicolas Rotsko
NY Id. No. 4964169
*Pro Hac Vice* Admission
Forthcoming

1751 Pinnacle Drive, Suite 1000
Tysons, VA  22102

T:  (703) 590-1234
F:  (703) 590-0366
E:  nrotsko@fluet.law

**Attorneys for Plaintiff Bizzell
Corporation**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BIZZELL CORPORATION,                    CIVIL ACTION

        Plaintiff,        No.

      v.

TRIPWIRE SOUTH, LLC,
TRIPWIRE AVIATION LLC, and
RYAN MORRIS,

        Defendants.

### __VERIFICATION__

I, Michael Hrobuchak, verify that I am the Chief Executive Officer of Bizzell Corporation ("Bizzell") and that I am authorized to execute this Verification on Bizzell's behalf. Having read the foregoing Verified Complaint, I verify that the statements therein are based on information of which I have personal knowledge or that I have gathered from and confirmed with other agents of Bizzell. While the language of the pleading is that of counsel, I verify that the averments contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief.

32

I understand that this Verification is made subject to the penalties relating to

unsworn falsification to authorities, <mark>28 U.S.C. § 1746</mark>.


Dated:  <u>April 16, 2025</u>                    <u>/s/ Michael Hrobuchak</u>

# Exhibit "A"

**Exhibit A**





**Exhibit A**



**Exhibit A**



# Exhibit "B"

Grey=Ryan Morris
Blue=Brizzell

**Exhibit B**



**Exhibit B**



**Exhibit B**



# Exhibit "C"

**Exhibit C**

**Tripwire South, LLC.**

1475 Highland Avenue Road

Gettysburg, PA  17325 USA

+17176482792

staff@tripwiresouth.com

https://www.tripwiresouth.com

| **BILL TO** | **SHIP TO** |
|---|---|
| Bizzell Corporation | Customer to Arrange |
| 1712 Pioneer | |
| Ste 135 | |
| Cheyenne, WY  82001 USA | |

**Invoice # 1629**

**DATE** 06/07/2024    **TERMS** Due on

**DUE DATE** 06/07/2024

**SHIP VIA**

Customer to Arrange

| DATE | DESCRIPTION | | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| | HE-COMPB-1 | Composition B, Pound | 41,407 | 22.00 | 910,954.00 |

| | |
|---|---|
| PAYMENT | 910,954.00 |
| TOTAL DUE | **$0.00** |

PAID

# Exhibit "D"

# Wire Transfer

## DWR-03822358 - BIZZELL CORPORATION (bizzell)


Servis Business Online

---

### Wire Details

| | |
|---|---|
| **Transaction Number** | DWR-03822358 |
| **Recurring Frequency** | One-Time Payment |
| **Amount** | USD 910,954.00 |
| **Debit Account** | ██████████████████ |
| **Notify Initiator Options** | Pending Actions: Notify via EMAIL |
| | Pending Release: Notify via EMAIL |
| | System Events: Notify via EMAIL |
| | Complete - Unsuccessful: Notify via EMAIL |
| | Complete - Successful: Notify via EMAIL |
| | Early Action Taken: Notify via EMAIL |
| | Early Action Removed: Notify via EMAIL |
| | Expired: Notify via EMAIL |
| **Payment Date** | 06/07/2024 |

### Originator Information

| | |
|---|---|
| **Originator Name** | BIZZELL CORPORATION |
| **Originator Address 1** | 1712 PIONEER ST SUITE 135 |
| **Originator Address 2** | CHEYENNE, WY 82001 US |
| **Originator Address 3** | |

### Beneficiary / Payee Information

| | |
|---|---|
| **Name** | Tripwire South LLC |
| **Beneficiary ID Type** | Account Number |
| **Beneficiary ID** | ████████ |
| **Address 1** | 1475 Highland Avenue Road |
| **Address 2** | urg, PA 17325 |
| **Address 3** | |
| **Beneficiary Country** | US |
| **Contact Name** | |
| **Phone Number** | |

### Beneficiary Bank Information

| | |
|---|---|
| **Name** | BELCO COMMUNITY CREDIT UNION |
| **Beneficiary Bank ID Type** | Fed ABA |
| **Beneficiary Bank ID** | ████████ |
| **Address 1** | |
| **Address 2** | |
| **Address 3** | |
| **Intl Routing Number** | |
| **Beneficiary Bank Country** | US |

### Additional Reference Information

| | |
|---|---|
| **Purpose Of Payment** | Invoice 1629 |
| **Additional Information For Beneficiary** | Bizzell Corporation: : Tripwire South LLC : Account: ████████ |

### Status History

| Timestamp | Status | Initiator | Description |
|---|---|---|---|
| Jun 7, 2024 1:14:52 PM CDT | Created | bizzell / dianna (DIANNA WILLIAMS) | Wire Created. |

---

# Exhibit "E"

**Exhibit E**

**Tripwire South, LLC.**

1475 Highland Avenue Road

Gettysburg, PA  17325 USA

+17176482792

staff@tripwiresouth.com

https://www.tripwiresouth.com

| BILL TO | SHIP TO |
|---|---|
| Bizzel Corporation | TBD |
| 1712 Pioneer | |
| Ste 135 | |
| Cheyenne, WY  82001 USA | |

**Invoice # 1598**

**DATE** 04/16/2024    **TERMS** Due on

**DUE DATE** 04/16/2024

**SHIP VIA**

Best Way

| DATE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| HE-CUSTOM | Black Powder "Snake Charges"  and "Spots" for 155mm Projectile, Per Lb UN 0027 1.1D PG II | 55,000 | 15.00 | 825,000.00 |
| HE-CUSTOM | Black Powder, Straight 50 Lbs per 4G Container For specific use in the 155mm Projectile UN 0027 1.1D PG II | 20,000 | 10.00 | 200,000.00 |

Thank you for your business!

| PAYMENT | 1,025,000.00 |
|---|---|
| TOTAL DUE | $0.00 |

# Exhibit "F"

# ACH Payment

## ACH-03746825 - BIZZELL CORPORATION (bizzell)



### ACH Batch Details

| | |
|---|---|
| **Transaction Number** | ACH-03746825 |
| **Import File Name** | |
| **Import Batch ID** | |
| **Recurring Frequency** | One-Time Payment |
| **Total Credits** | $1,025,000.00 (1) |
| **ACH Company** | BIZZELL CORP ███████ |
| **Batch Type** | Business (CCD) - Credit Only |
| **Offset Account** | ████████████████████████ |
| **Memo** | |
| **Company Entry Description** | Tripwire |
| **Notify Initiator Options** | Pending Actions: Notify via EMAIL |
| | System Events: Notify via EMAIL |
| | Complete - Unsuccessful: Notify via EMAIL |
| | Complete - Successful: Notify via EMAIL |
| | Early Action Taken: Notify via EMAIL |
| | Early Action Removed: Notify via EMAIL |
| | Expired: Notify via EMAIL |
| **Payment Creation Date** | May 3, 2024 8:04 AM CDT |
| **Processing Date** | 05/03/2024 |
| **Payment Date** | 05/06/2024 |

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| | Tripwire South LLC (Tripwire South) | ████ | ██████ | $1,025,000.00 | Invoice 1598 | |

### Status History

| Timestamp | Status | Initiator | Description |
|---|---|---|---|
| May 3, 2024 8:04:20 AM CDT | Created | bizzell / dianna (DIANNA WILLIAMS) | Batch Created. |

# Exhibit "G"

**Tripwire South, LLC.**

1475 Highland Avenue Road

Gettysburg, PA  17325 USA

+17176482792

staff@tripwiresouth.com

https://www.tripwiresouth.com

| BILL TO | SHIP TO |
|---|---|
| Bizzell Corporation | Bizzell Corporation |
| 1712 Pioneer | 1712 Pioneer |
| Ste 135 | Ste 135 |
| Cheyenne, WY  82001 USA | Cheyenne, WY  82001 USA |

**Invoice # 1631**

**DATE** 06/11/2024    **TERMS** Due on

**DUE DATE** 06/11/2024

| DATE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| HE-CUSTOM | M6 = 95,920 lbs | 95,920 | 20.50 | 1,966,360.00 |

PAID

| | |
|---|---|
| PAYMENT | 1,966,360.00 |
| TOTAL DUE | $0.00 |

# Exhibit "H"

# Wire Transfer

## DWR-03840084 - BIZZELL CORPORATION (bizzell)

**Servis** Business Online

### Wire Details

| | |
|---|---|
| **Transaction Number** | DWR-03840084 |
| **Recurring Frequency** | One-Time Payment |
| **Amount** | USD 1,966,360.00 |
| **Debit Account** | ▮▮▮▮▮▮▮▮ |
| **Notify Initiator Options** | Pending Actions: Notify via EMAIL |
| | Pending Release: Notify via EMAIL |
| | System Events: Notify via EMAIL |
| | Complete - Unsuccessful: Notify via EMAIL |
| | Complete - Successful: Notify via EMAIL |
| | Early Action Taken: Notify via EMAIL |
| | Early Action Removed: Notify via EMAIL |
| | Expired: Notify via EMAIL |
| **Payment Date** | 06/17/2024 |

### Originator Information

| | |
|---|---|
| **Originator Name** | BIZZELL CORPORATION |
| **Originator Address 1** | 1712 PIONEER ST SUITE 135 |
| **Originator Address 2** | CHEYENNE, WY 82001 US |
| **Originator Address 3** | |

### Beneficiary / Payee Information

| | |
|---|---|
| **Name** | Tripwire South LLC |
| **Beneficiary ID Type** | Account Number |
| **Beneficiary ID** | ▮▮▮▮▮ |
| **Address 1** | 1475 Highland Avenue Road |
| **Address 2** | urg, PA 17325 |
| **Address 3** | |
| **Beneficiary Country** | US |
| **Contact Name** | |
| **Phone Number** | |

### Beneficiary Bank Information

| | |
|---|---|
| **Name** | BELCO COMMUNITY CREDIT UNION |
| **Beneficiary Bank ID Type** | Fed ABA |
| **Beneficiary Bank ID** | ▮▮▮▮ |
| **Address 1** | |
| **Address 2** | |
| **Address 3** | |
| **Intl Routing Number** | |
| **Beneficiary Bank Country** | US |

### Additional Reference Information

| | |
|---|---|
| **Purpose Of Payment** | Quote 1630 |
| **Additional Information For Beneficiary** | Bizzell Corp: Tripwire South LLC : Account NumberAccount: ▮▮▮▮▮ |

### Status History

| Timestamp | Status | Initiator | Description |
|---|---|---|---|
| Jun 17, 2024 12:21:52 PM CDT | Created | bizzell / dianna (DIANNA WILLIAMS) | Wire Created. |

JS 44 (Rev. 03/24)

Case 1:25-cv-00680-KMN Document 31-2 Filed 05/28/25 Page 70 of 77
Case 1:25-cv-00680-KMN Document 1-9 Filed 04/17/25 Page 1 of 1

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Bizzell Corporation

## DEFENDANTS

Tripwire South, LLC, et al.

**(b)** County of Residence of First Listed Plaintiff  Laramie County, WY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Adams County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Julian E. Neiser, Spilman Thomas & Battle, PLLC, 301 Grant St., Ste. 3440, Pittsburgh, Pa. 15219 412.325.1116

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [x] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability / Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine / [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability / Injury Product Liability | | [ ] 840 Trademark | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle / **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability / [ ] 370 Other Fraud | **LABOR** | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [x] 190 Other Contract | [ ] 360 Other Personal Injury / [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice / [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | [ ] 790 Other Labor Litigation | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | [ ] 791 Employee Retirement Income Security Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other / **Other:** | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education / [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1332(a)

Brief description of cause:
Fraudulent Inducement -- Fraud -- Breach of Contract -- Rescission and Restitution -- Unjust Enrichment

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ $3,902,314 + $250,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes  [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE  April 16, 2025

SIGNATURE OF ATTORNEY OF RECORD  /s/ Julian E. Neiser

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Middle District of Pennsylvania

| | | |
|---|---|---|
| BIZZELL CORPORATION, | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | |
| v. | ) | Civil Action No. |
| TRIPWIRE SOUTH, LLC, | ) | |
| TRIPWIRE AVIATION LLC, | ) | |
| RYAN MORRIS, | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   Tripwire South, LLC
1475 Highland Avenue Road
Gettysburg, PA  17325

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Julian E. Neiser, Esquire
Spilman Thomas & Battle, PLLC
One Oxford Centre, Suite 3440
301 Grant Street
Pittsburgh, PA  15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# Exhibit "2"

**Acuity – Janus Global, LLC**



15 May 2024

Amentum Services, Inc.
PMO – Program Management Office
1 South Maine Ave
Hawthorne Army Depot (HWAD)
Hawthorne, NV 89415
Attention:  Christine Cissa, Subcontract and Procurement Manager

Subject:  Subcontract 2021-12-004 – Hawthorne Army Depot (HWAD)
              Remote Saw Process Opportunity for the Walleye Project

Dear Ms. Cissa:

This letter outlines a proposal to implement a remote saw method to demilitarize Walleye warheads adding a capability and pathway in addition to the existing Steam-Out, Hot-Gas, Inert-Demil process. As part of Acuity's ongoing commitment to maximize the use of existing HWAD facilities and equipment, enhance efficiency, and introduce new demilitarization processes, we suggest implementing a Proof-of-Concept trial for the 561 warheads currently awaiting steam-out.

Upon completion of the remote sawing of the Walleye warheads, Acuity – Janus Global, LLC (Acuity) will gain the demilitarized material as Bureau of Alcohol, Tobacco, Firearms and Explosives (BATF) donor material. Subsequently, the donor material will be transferred to Bonetti Explosives LLC under their ATF license, and they will provide an End User's agreement in compliance with all applicable regulations. This proposal pertains solely to the 561 warheads currently awaiting steam-out, with the trial's results to be evaluated before considering similar methods for future operations.

**Process Change**

The remote saw method, which involves cutting the warheads into sections, has been used at the Hawthorne Army Depot before. This method complies with all regulatory demilitarization requirements and was most recently conducted in September 2022 for Walleye Warheads. Detailed procedures and guidelines related to this process are outlined in the Walleye Disassembly and Sawing Operation Standard Operating Procedure.

Besides the fuzes, which are in storage until they can be disposed of at New Bomb, all non-warhead

10701 Parkridge Blvd., Suite 200, Reston, VA 20191
acuityinternational.com

**EXHIBIT "L"**

## Acuity – Janus Global, LLC



Walleye components have been demilitarized and are waiting to be sold as scrap metal. Currently, the remaining warheads are stored in the 112-storage group and 117-12B. The disassembled Walleye warheads will be retrieved from storage and transported to the demilitarization facility equipped for saw operations (facility 117-8/9). There, the warhead will be remotely cut into two equal cross-sections.

### Regulatory Compliance

Once the warhead is cut, the Walleye Missile meets the DEMIL Code "G" in accordance with DOD Manual 4160.28, Volume 2 Defense Demilitarization: Demilitarization Procedures, dated November 1, 2022, and can no longer be utilized for its intended purpose.

Although the warhead pieces are explosively laden, the explosives derived from the halved warheads will be repurposed as commercial donor material. Because the explosives are being recovered and repurposed, they do not have a demilitarization requirement, allowing them to be gained under Acuity's Bureau of Alcohol, Tobacco, Firearms and Explosives (BATF) license as commercial explosives.

After the warhead is cut, an Ammunition Transfer Record (ATR) using DD form 4508 will be created to gain the explosive-laden pieces into Acuity's Bureau of Alcohol, Tobacco, Firearms and Explosives (BATF) inventory. The material will then be assigned an EX-number approved by the U.S. Department of Transportation, specifically the Pipeline and Hazardous Materials Safety Administration (PHMSA). It will then be stored securely within Acuity's BATF-regulated bunkers, ensuring full compliance with all federal explosive regulations.

### Bonetti Explosives LLC

Acuity intends to transfer the explosives to Bonetti Explosives LLC, which will take ownership of the donor material under its ATF license. Bonetti Explosives will provide an end-user agreement that meets all applicable regulations. Additionally, Bonetti Explosives LLC will arrange and fund the transportation of all explosive materials to one of its two BATF-regulated storage facilities in Texas. These commercial explosives, received from Acuity, will be repurposed by Bonetti Explosives LLC as donor explosives.

Bonetti Explosives LLC is legally licensed to store all classes of explosives, fireworks, arms, and ammunition. The company possesses several federal firearms licenses (FFL) issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Federal Firearms Licensing Center (FFLC), in compliance with the Gun Control Act of 1968. To include:

- **Federal Explosive License Type 20** – Manufacture of Explosives
- **Federal Firearms License Type 10** - Manufacturer of Destructive Devices, Ammunition for Destructive Devices or Armor Piercing Ammunition
- **Federal Firearms License Type 07** - Manufacturer of Firearms Other Than Destructive Devices

10701 Parkridge Blvd., Suite 200, Reston, VA 20191
acuityinternational.com

## Acuity – Janus Global, LLC



Bonetti Explosives LLC is a reputable company in the Explosives and Unexploded Ordnance Remediation Industry. It is recognized for its extensive experience and comprehensive licensing under the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). With a substantial corporate history, Bonetti Explosives LLC has served clients including but not limited to:

- U.S. Department of Defense
- Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)
- U.S. Navy
- U.S. Army
- NASA
- USA Environmental
- Jacobs Engineering Group
- Tetra Tech
- American EOD Services
- Redstone Arsenal

Additional information about Bonetti Explosives LLC, including detailed descriptions of their services, can be found on their website at https://www.bonettiexplosives.com.

**Packaging and Transportation Regulatory Compliance**
To ensure the secure transportation of commercial explosives, a detailed packaging plan is being developed in compliance with CFR 49 Part 172 (transportation of hazardous material). To ensure regulatory compliance, all explosive-laden vehicles are inspected by qualified DOT inspectors before departing the base. This plan incorporates the use of Extra-Duty Bulk Containers measuring 48"x45"x34" or 45"x40"x34".

The initial step in the packaging process involves horizontally placing four cut pieces in each bulk container, each consisting of Comp B/Hexolite and with a total Net Explosive Weight (NEW) of approximately 830 lbs. Each cut piece will have its exposed explosive end sealed using either neoprene, antistatic bags, or similar rubber-type material to maintain the integrity and safety of the explosive materials during handling and transit. In addition, all material being prepared for shipment is signed off by a DOT qualified inspector.

Each pair of cut warhead pieces will be encased in static-resistant packaging to prevent material flaking and mitigate the accumulation of static charges during transportation. The cut pieces are then arranged side by side with their corresponding halves inside the bulk container. Cardboard filler will be placed between the individual pieces to ensure a tight pack and prevent movement or shifting during the

10701 Parkridge Blvd., Suite 200, Reston, VA 20191
acuityinternational.com

## Acuity – Janus Global, LLC



shipment.

To further secure the contents within the bulk container, wood cribbing and additional cardboard filler will be used to support the contents tightly and prevent any potential movement. A lid, made from at least 3/4-inch-thick plywood and cut to match the curb's dimensions, will then be securely fastened to the curb with a minimum of two straps of banding steel, applied in accordance with the American Society for Testing and Materials (ASTM) international standards.

### Recovered Explosive Revenue Management

The Walleye Missiles are priced on a per ton basis as per the fixed unit pricing schedule. This pricing accounts for the expected revenue from the recovery and recycling of propellants, explosives, pyrotechnics, explosive materials, scrap metal, and hazardous materials. We recognize that this alternative pathway will result in a loss of income for Acuity as we will not receive revenue from the recovered explosive sales. For the Proof of Concept, this is acceptable as it provides an evaluation of a process that may result in future efficiencies.

### Enhanced Safety

Replacing multiple separate processes with a single, streamlined operation enhances overall safety by eliminating the hazards associated with each replaced process. When three processes are replaced with one, the potential for human error, equipment failure, and procedural mishaps is significantly reduced. Simplifying the workflow into a single remote saw operation mitigates cumulative risk factors and streamlines operational efficiency.

As a Proof of Concept, we propose transitioning to the remote saw process to demilitarize the remainder of the Walleye Warheads. This adjustment will ensure compliance with safety standards and regulatory requirements. Therefore, Acuity respectfully requests that we discuss the remote saw opportunity at Amentum's earliest convenience.

Thank you.

Respectfully,

*JoAnne Lawonn*

JoAnne Lawonn
Contracts Management Specialist

10701 Parkridge Blvd., Suite 200, Reston, VA 20191
acuityinternational.com