# OPERATING AGREEMENT
## OF
## TRIPWIRE AVIATION
### (A Pennsylvania Limited Liability Company)

This Limited Liability Company Agreement (hereinafter referred to as the "Agreement") is made on this 6th Day of July, to be effective as of the day of filing the Certificate of Formation with the Pennsylvania Secretary of State, by Michael Dickerson (hereinafter referred to collectively as the "Members" and individually as a "Member") and Tripwire Aviation, LLC, a Pennsylvania limited liability company (hereinafter referred to as "Company").

## RECITALS

The Company has been organized as a Pennsylvania limited liability company by the filing of a certificate of organization with the Department of State of the Pennsylvania under and pursuant to the Act.

## AGREEMENTS

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, and intending to be legally bound hereby, the Members agree as follows:

1.    <u>Definitions</u>.  In addition to the terms defined in other provisions of this Agreement, including without limitation Section B.1 of <u>Annex B</u>, the following terms shall have the meanings set forth below unless the context requires otherwise:

"Act."  Pennsylvania Limited Liability Company Act

"Affiliate."  As to any Person, any other Person that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with such Person or, if such Person is an individual, the Immediate Family of such Person or trusts solely for the benefit of such Immediate Family.  As used in this definition, the term "control" means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or credit arrangement or otherwise.

"Agreement."  This Operating Agreement, as amended, modified, supplemented or restated from time to time.

"Capital Account."  The individual account maintained by the Company with respect to each Member as provided in <u>Annex B</u>.

"Capital Contribution."  The aggregate amount of cash and the agreed value of any property

770848.2

**EXHIBIT "P"**

or services (as determined by the Member and the Company) contributed by each Member to the Company as provided in Section 6. In the case of a Member that acquires an Interest in the Company by an assignment or transfer in accordance with the terms of this Agreement, "Capital Contribution" means the Capital Contribution of that Member's predecessor in an amount proportionate to the acquired Percentage Interest.

"Certificate." The certificate of organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Department of State of Pennsylvania pursuant to the Act.

"Claim." See Section 19(b).

"Code." The Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section of the Code refers not only to that specific section but also to any corresponding provision of any federal tax statute enacted after the date of this Agreement, as the specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing the reference.

"Covered Person." A Member, any Affiliate of a Member, any officer, director, shareholder, partner, employee, representative or agent of a Member, or their respective Affiliates, or any officer, employee or agent of the Company or its Affiliates.

"Damages." See Section 19(a).

"Fiscal Year." (a) The period commencing upon the formation of the Company and ending on such date as the Members shall determine, (b) any subsequent twelve (12) month or 52/53 week period ending on such date as the Members shall determine, or (c) any portion of the period described in clause (b) of this sentence for which the Company is required to allocate Net Income and Net Loss and other items pursuant to Annex B.

"Immediate Family." With respect to any individual, such individual's parents, spouse, issue and adopted children, or any of them.

"Indemnified Party." See Section 19(b).

"Initial Members." Michael Dickerson.

"Interest." A Member's limited liability company interest in the Company, including, without limitation, such Member's share of the profits and losses of the Company and such Member's right to receive distributions (liquidating or otherwise), allocations and information, and such Member's right to consent to or approve actions by the Company, all in accordance with the provisions of this Agreement and the Act.

-2-

"Laws." Any of the following:

(1)    all constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules, regulations and municipal by-laws, whether domestic, foreign or international;

(2)    all judgments, orders, writs, injunctions, decisions, rulings, decrees and awards of any governmental body;

(3)    all policies, practices and guidelines of any governmental body; and

(4)    any amendment, modification, re-enactment, restatement or extension of any of the foregoing, in each case binding on or affecting the party or Person referred to in the context in which such word is used.

"Majority Vote." The written approval of, or the affirmative vote by, Members holding at least 51% of the Percentage Interests.

"Member." Each Initial Member and any Person admitted as an additional Member or a substitute Member pursuant to the provisions of this Agreement, in such Person's capacity as, and so long as such Person is, a Member of the Company. "Members" means two or more Persons when acting in their capacities as Members of the Company. For purposes of the application of a provision of the Act to the Company, the Members shall constitute one class or group of members. Annex A shall be amended from time to time to show the current Members.

"Notice." See Section 19b).

"Percentage Interest." The Interest of a Member in the Company, expressed as a portion of one hundred percent, as shown on Annex A .

"Person." A natural person, corporation, general or limited partnership, limited liability company, joint venture, trust, estate, association or other legal entity or organization.

"Tax Payment Loan." See Section 9(c).

"Treasury Regulations." The income tax regulations, including temporary regulations, promulgated under the Code, as those regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Withholding Tax Act." See Section 9(c).

2.    Organization. The Members have heretofore authorized the organization of the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement.

770848.2

3.  <u>Purpose</u>.  The Company is formed for the object and purpose of operating a supply and operations company, specializing in products used by or in connection with persons and entities performing law enforcement, fire service, emergency medical services, hazmat, special weapons and tactics, corporate security and bomb squad functions and engaging in any kind of lawful activity related to the foregoing.

4.  <u>Term</u>.  The existence of the Company commenced on the date the Certificate was filed in the office of the Department of State of Pennsylvania and shall continue until the Company is dissolved in accordance with the provisions of this Agreement and the Act.

5.  <u>Principal Office</u>.  The principal office of the Company shall be located 1685 Baltimore Pike Gettysburg, PA 17325, or at such other location as may be determined, from time to time, by the Members.  The Company may also have such other offices at such other locations as, from time to time, may be determined by the Members.

6.  <u>Company Capital and Percentage Interests</u>.

(a)  <u>Initial Capital Contributions</u>.  The initial Capital Contribution that each Member has made or is deemed to have made to the Company is set forth opposite the Member's name in <u>Annex A</u>.

(b)  <u>Additional Capital Contributions</u>.  In the event that funds are not available (after best commercially reasonable efforts by the Company) from any loan (meaning individually or collectively, a loan from a third party lender, including any Member of the Company) to the Company for any obligation of the Company and the Company does not otherwise have funds for such obligation, then each Member agrees with the other Members to make an additional capital contribution (each an "Additional Capital Contribution") to the Company, within ten (10) days of the effective date of the Members holding a Majority Vote making a determination of the need for the amount of an Additional Capital Contribution in an amount equal to the product of such Member's Percentage Interest times the amount of such Additional Capital Contribution. The Members agree that any such Additional Contribution shall be used only for the specific purposes for which determination of the need with respect thereto was made.  If any funds from such Additional Capital Contribution remain after the satisfaction of the obligations for which it was funded, then the Company shall deposit such remaining funds in the Company's bank account.  In the event any Members shall fail or refuse to make an Additional Capital Contribution after any notice required hereunder shall have been given (the "Defaulting Member"), any Members who made such Additional Capital Contribution (such non-defaulting Member hereinafter referred to as the "Non Defaulting Member") may with respect to such Defaulting Member, make the Additional Capital Contribution which the Defaulting Member failed to make, in which event the Percentage Interests of each Member shall be recalculated as of the date on which the Additional Capital Contribution is made.  The recalculated Percentage Interest of each Member shall be an amount expressed as a percentage equal to a fraction, the numerator of which shall be (i) the aggregate amount of all Initial Capital Contributions of the Member,

-4-

plus (ii) all Additional Capital Contributions previously made by the Member, plus (iii) the Additional Capital Contribution which is the subject of the recalculation; and the denominator of which shall be the total aggregate amount of all Initial Capital Contributions and Additional Capital Contributions of all Members, including the Additional Capital Contribution which is the subject of the recalculation. If more than one Member desires to make an Additional Contribution, each may do so in proportion to his, her or its respective Percentage Interest. All recalculated Percentage Interests shall be expressed as a decimal rounded to the fourth digit. As of the recalculation date, the Capital Accounts of the Members shall be reallocated so that the respective Capital Accounts are in the same proportion as the respective Percentage Interest.

(c)    No interest. Interest shall not be paid on or with respect to the Capital Contribution or Capital Account of any Member.

(d)    No right to return of Capital Contributions. Although the Company may make distributions to the Members from time to time as a return of their Capital Contributions, a Member shall not have the right to withdraw or demand a return of any of the Member's Capital Contribution or Capital Account, except upon dissolution or liquidation of the Company.

(e)    Percentage Interests. The Percentage Interest of each Member shall be as set forth in Annex A.

7.    Capital Accounts. A Capital Account shall be established and maintained on the books of the Company for each Member as provided in Annex B.

8.    Allocation of Net Income or Net Loss. Net Income or Net Loss shall be allocated to the Members as provided in Annex B.

9.    Distributions.

(a)    General rule. Subject to subsections (b) and (c), distributions of cash and/or other assets or property of the Company, from whatever source (including, without limitation, net proceeds of Company operations and the sale, financing or refinancing of Company assets) shall be made to the Members in accordance with their respective Percentage Interests at such times (and not less frequently than semi-annually), and in such amounts (as all available cash except reserves created hereunder), as the Members shall determine. In making determinations regarding distributions, the Members may set aside funds and establish reserves for such items as the Members shall determine, including, without limitation, working capital, capital expenditures, acquisition of other assets by the Company and the satisfaction of liabilities; provided the performance of the forgoing actions are in the furtherance of the reasonable needs of the Company's business.

770848.2

(b)    <u>Minimum distribution</u>.  The Company shall attempt to distribute to the Members, within 90 days after the close of that fiscal year, no less than the amount determined by multiplying the Company's taxable income (computed as set forth in this sentence) by the highest composite federal, state and local income tax rate applicable to any Member.  Nothing herein shall require the Company to borrow money or reduce its cash flow so as to restrict its ability to operate the day-to-day activities of the business in order to make such distributions.

10.    <u>Other Interests of Members</u>.  Any Member or Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper.  No Member or Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if the opportunity is of a character that, if presented to the Company, could be taken by the Company, and any Member or Affiliate thereof shall have the right to take for its own account (individually or as a partner or fiduciary) or to recommend to others any such particular investment opportunity.

11.    <u>Control and Management</u>.

(a)    <u>Power and Authority of the Members</u>.  Day-to-day management of the business and affairs of the Company, as defined in subsection (b) hereof, shall be vested in a Manager.  All other business affairs of the Company shall be subject to the approval of the Members which approval shall be determined by Majority Vote of the Members.  The vote, decision, determination or other action permitted or required to be taken by the Members on such matters shall be considered approved, consented to and/or ratified when approved by a Majority Vote of the Members.  Accordingly and notwithstanding anything contained herein to the contrary, any decision, determination, approval or other action which is required to be made or performed by the Members pursuant to the Act and/or this Agreement shall require a Majority Vote of the Members.

(b)    <u>Appointment of Manager.</u>  The Members hereby appoint Ryan J. Morris as Manager of the Company and he shall serve in such capacity until replaced by a Majority Vote of the Members.  Appointment of the Manager shall not be deemed to reduce the authority and powers of the Members under this Agreement or applicable law, but rather is intended as an administrative convenience for the purpose of handling the day-to-day business affairs of the Company.  In such capacity, the Manager shall only be authorized to conduct the following activities without the approval of the Members:

(i)    being the duly authorized signatory on Company bank accounts to pay

all ordinary and necessary expenses of the business not in excess of $15,000. Any expenses above the amount of $15,000 or unusual in nature shall be approved by the Majority Vote of the Members;

   (ii) managing the Company's available cash flow and reserves to ensure that funds in excess of weekly capital needs are deposited in interest bearing accounts;

   (iii) entering into negotiations on behalf of the Company on all contracts provided that final approval of any contract that is unusual in nature shall be approved by the Majority Vote of the Members;

   (iv) executing, on the Company's behalf, such documents and agreements as the Manager deems to be in the best interest of the Company and/or as so directed by the Members; and

   (v) such other authority as may be given to him by the Members from time to time.

  (c) <u>Removal of the Manager</u>.  The Manager may be removed by the Majority Vote of the Members.

12. <u>Transfer of Percentage Interests</u>.

  (a) <u>Restrictions on Transfer</u>.  Except as otherwise provided herein, a Percentage Interest, or any part thereof, may not be sold, assigned, transferred, given, bequeathed, donated, mortgaged, pledged, attached, levied upon, seized by or for creditors, or otherwise encumbered or disposed of (hereinafter, a "Transfer," not withstanding the forgoing a transfer resulting from a Member's death shall not constitute a Transfer hereunder), whether by act of a Member or by operation of law, unless all of the following "Conditions of Transfer" have been satisfied:

  (i) the Transfer will not require registration under any federal or state securities laws, as determined by legal counsel satisfactory to the Manager;

  (ii) the transferee delivers to the Company a written instrument agreeing to be bound by the terms of this Agreement in form and content satisfactory to the Manager;

  (iii) the Transfer will not result in the termination of the Company pursuant to IRC Section 708, as determined by legal counsel satisfactory to the Manager; unless the Transfer is approved by the Members;

  (iv) the Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended, as determined by legal counsel satisfactory to the Manager;

-7-

(v)    the transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the transferred Interest; and

(vi)    the transferor first complies with the provisions set forth in Section 12(d).

(b)    <u>Effect of Transfer</u>.  If the Conditions of Transfer are satisfied, then a Member may Transfer all or any portion of the Member's Percentage Interest and the transferee shall become a substitute Member.  Transfers of Percentage Interest will be recorded on the books of the Company and by the amendment of Annex A.  A copy of the amended Annex A shall be distributed by the Company to each Member listed thereon.  Upon the transfer of a Percentage Interest, the transferee will succeed to the Capital Account of the transferor in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv).

(c)    <u>Acknowledgement</u>.  Each Member hereby acknowledges the reasonableness of the prohibitions, conditions and procedures contained in this Section 12 in view of the purposes of the Company and the relationship of the Members.  The Transfer of any Percentage Interest or part thereof in violation of the provisions contained in this Section 12 shall be deemed invalid, null and void, and of no force or effect.

(d)    <u>Transfer Procedure</u>.

(i)    If a Member (a "Transferor") desires to Transfer all or any portion of his or her Interest, the Transferor shall notify the Company of that desire (the "Transfer Notice").  The Transfer Notice shall identify the Percentage Interest or part thereof proposed to be transferred.  The Company shall have the option (the "Company Purchase Option") to purchase all of the Percentage Interest proposed to be transferred for a price (the "Purchase Price") equal to the lesser of the "Fair Market Value" of the Percentage Interest to be sold or the "Third Party Offer Price" (each hereinafter defined).

(ii)    The Company Purchase Option shall be and remain irrevocable for a period (the "Transfer Period") ending at 11:59 p.m., local time, at the Company's principal office on the thirtieth (30th) day following the day the Transfer Notice is given to the Company.

(iii)    At any time during the Transfer Period, the Members may elect on behalf of the Company to exercise the Company Purchase Option by giving written notice of the Company's election to the Transferor.

(iv)    If the Members elect to exercise the Company Purchase Option, the Company's notice of its election shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than five (5) days after the

-8-

date of the notice of election or more than thirty (30) days after the expiration of the Transfer Period. The Purchase Price shall be paid by the Company to the Transferor in cash on the Transfer Closing Date.

(v)    If the Members fail or decline to exercise the Company Purchase Option, the remaining Members shall have the option (the "Members Purchase Option") to purchase all of the Percentage Interest proposed to be Transferred on a pro-rata basis by notifying the Transferor within ten (10) days after the expiration or earlier termination of the Transfer Period of their intent to purchase the Percentage Interest proposed to be transferred on the same terms offered to the Company. If the remaining Members do not exercise the Members Purchase Option to purchase all of the Percentage Interest proposed to be transferred, the Transferor shall be permitted to offer and sell such Interest for a period of sixty (60) days (the "Free Transfer Period") after the expiration of the Transfer Period at the Third Party Offer Price to the third party making such offer, if any, or to any other party at a price not less than the Formula Price. If the Transferor does not Transfer such Percentage Interest within the Free Transfer Period, the Transferor's right to Transfer the Percentage Interest shall again become subject to the prohibitions against transfer set forth in this Section 12.

(vi)    Any Transfer of a Percentage Interest or part thereof made after the last day of the Free Transfer Period or without strict compliance with the terms, provisions, and conditions of this Section and the other terms, provisions, and conditions of this Agreement, shall be null, void, and of no force or effect.

(e)    <u>Member Determinations under Section 12.</u>  All determinations by the Members required under this Section 12 shall be made by a Majority Vote of the Members, excluding the Membership Interest of the Member whose Interest is proposed to be Transferred.

(f)    The following definitions shall apply for purposes of Section 12:

(i)    "<u>Fair Market Price</u>" means the price of the Percentage Interest being sold as determined by the accountants regularly employed by the Company, with such accountants taking into consideration both the value of the assets of the Company and the historic and estimated future distributions by the Company to the Members.

(ii)    "<u>Third Party Offer Price</u>" means the purchase price for the Percentage Interest proposed to be Transferred set forth in a bona fide written offer by or agreement of Transfer with a third party.

(g)    <u>Permitted Transfers.</u>  Notwithstanding any of the provisions of this Agreement, any Member may transfer at any time all or any portion of his or her Percentage Interest to any

770848.2

other Member, for a price to be agreed upon between the two transferring Members. The transferee of any such transfer shall be responsible for providing appropriate notice to the Company so that Annex A may be amended appropriately.

13.     Death or permanent Disability of Members.

(a)     Upon the death or permanent disability of a Member, the estate of the deceased Member or the distributees of his or her estate shall offer to sell the Percentage Interest of the deceased Member to the surviving Members. The surviving Members shall have the right to buy the Percentage Interest of the deceased Member in proportion to their respective Percentage Interest; provided that if one or more of the surviving Members does not exercise his right to purchase, then the remaining Members shall have the right to purchase such additional shares of the Percentage Interest of the deceased Member in proportion to the ratio between the Percentage Interest of the surviving Member desiring to purchase an additional share and the Percentage Interest of all of the surviving Members who desire to purchase an additional share of the Percentage Interest of the deceased Member. If the surviving Members do not elect to purchase all of the Percentage Interest of the deceased Member, then the estate or distributees of the estate of the deceased Member, as applicable, may elect not to sell the Percentage Interest of the deceased Member and, in such event, shall have the right to distribute the Percentage Interest of the deceased Member in accordance with the will or laws governing the distribution of the assets of the estate of the deceased Member.

(b)     The purchase price for the Membership interest of the deceased Member shall be equal to the "Fair Market Value" of such Percentage Interest, as determined above.

(c)     Settlement on the purchase of the Membership interest of the deceased Member shall be held within ninety (90) days of the death of the deceased Member. The full purchase price for the deceased Member's interest in the Company shall be paid in full by any of the other Members who have elected to purchase such deceased Member's Percentage Interest.

(d)     The estate or distributees of the deceased Member, as applicable, shall deliver to the purchasing Members, a duly executed assignment and release document whereby the estate and/or distributees of the deceased Member assign to the purchasing Members the Percentage Interest of the deceased Member and release the purchasing Members from any and all liabilities and claims relating to the Company.

14.     Admission of Additional Members. Except as provided in Section 12 in connection with Transfers of Percentage Interest, additional Members may be admitted to the Company upon such terms and conditions as may be approved by a Majority Vote of the Members.

770848.2

15.   <u>Involuntary Transfers</u>.  Notwithstanding anything contained herein to the contrary, none of the following events shall be considered a Permitted Transfer and in the event of the occurrence of any of the following events, the right of first refusal provided for in Section 12(d) of this Agreement shall become effective and such affected Member shall first have to offer to sell the Percentage Interest to the Company and/or the other Members pursuant to the terms of Section 12(d).

(a)     Any of a Member's Percentage Interest in the Company is awarded to a spouse of such Member in a proceeding for equitable distribution of marital property upon divorce, or a similar court ordered distribution of property incident to the divorce of such Member, whereupon the right of first refusal to purchase shall mature with respect to such Percentage Interest awarded to the spouse at such time as the Company has received actual notice thereof.

(b)     A receiver or trustee is appointed in any proceeding under bankruptcy laws to take charge of the assets of a Member, whereupon the right of first refusal to purchase shall mature at such time as the Company has received actual notice thereof with respect to all of the Percentage Interest of which the Member is the record owner at the date of appointment.

(c)     Execution is levied against or attachment or other process served for purpose of having any of the Percentage Interest transferred, whereupon the right of first refusal shall arise at such time as the Company has received actual notice thereof with respect to the Percentage Interest to which the execution or other process relates.

The Company shall promptly notify all of the Members of the occurrence of, and the material facts associated with, an event described in paragraphs (a) through (c) triggering the right of first refusal to purchase such affected Member's Percentage Interests.  Such notice by the Company shall be the equivalent of a Transfer Notice as provided for in Section 12(d).

16.   <u>Dissolution</u>.

(a)     <u>Events of Dissolution</u>.

(i)     The Company shall be dissolved, and its affairs wound up, upon the first to occur of the following:

(A)     a Majority Vote of the Members.

(B)     The entry of an order of judicial dissolution of the Company

(ii)     The death, dissolution, retirement, resignation, expulsion or

bankruptcy of a Member or the occurrence of any other event that terminates the continued membership of a Member shall not cause a dissolution of the Company.

(b)    Certificate of Dissolution.  Within 180 days following the dissolution and the commencement of the winding up of the Company, the Company shall execute a Certificate of Dissolution in the form prescribed by the Act.

(c)    Distributions upon Dissolution.   In the event of the dissolution of the Company, the assets of the Company shall be liquidated in such manner as the Members shall determine and, after the obligations of the Company to third parties have been discharged or provided for in accordance with applicable law, the net proceeds of the liquidation shall be distributed as follows:

  (i)    first, among the Members, if any, who have made unrepaid loans or advances to the Company, in an amount up to the aggregate amount of such unrepaid loans and advances, and in proportion to the amount of such loans and advances and the unpaid interest thereon;

  (ii)    second, among the Members, in an amount up to the aggregate amount of their unrepaid Capital Contributions, and in proportion to the amounts of such unrepaid Capital Contributions; and

  (iii)    third, among the Members in accordance with their respective Percentage Interests.

(d)    Procedure.  A reasonable time shall be allowed for the liquidation of the Company in order to minimize the losses normally attendant upon a liquidation.

(e)    Final accounting.   In connection with the Company's liquidation, the Company's accountants shall compile and furnish to each Member a statement setting forth the assets and liabilities of the Company as of the date of complete liquidation.

17.    Books and Records.

(a)    General rule.  The Manager shall cause to be kept full and accurate books and records of the Company.   All books and records of the Company shall be kept at the Company's principal office and shall be available at such location at reasonable times for inspection and copying by the Members or their duly authorized representatives.  The books

-12-

of the Company shall be kept on a cash basis.

(b)     Tax information. The Manager shall arrange for the preparation of all tax returns required to be filed for the Company. Each Member shall be entitled to receive, upon written request, copies of all federal, state and local income tax returns and information returns, if any, which the Company is required to file. All information needed by the Members and other Persons who were Members during the applicable calendar year for income tax purposes shall be prepared by the Company's accountants and furnished to each such Person after the end of each calendar year of the Company.

(c)     Annual financial information. The books of the Company shall be closed and balanced at the end of each Fiscal Year. The Members shall cause to be made available to each Member, upon written request, within 120 days after the close of each Fiscal Year, copies of the Company's annual financial statements, including a written balance sheet and statement of income or loss. The financial statements shall also indicate each Member's share of the Net Income and Net Loss and other relevant fiscal items of the Company for that year.

18.     Liability of Members. The Members shall have no liability for the obligations or liabilities of the Company except to the extent required by the Act.

19.     Indemnification.

(a)     Indemnification of Covered Persons. Except as expressly prohibited by Law, the Company shall indemnify, defend and hold harmless each Covered Person from and against any and all debts, losses, claims, damages, costs, demands, fines, judgments, contracts (implied and expressed, written and unwritten), penalties, obligations, payments, liabilities of every type and nature (whether known or unknown, fixed or contingent), including, without limitation, those arising out of any lawsuit, action or proceeding (whether brought by a party to this Agreement or by any third party), together with any reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, out-of-pocket expenses and other reasonable costs and expenses incurred in investigating, preparing or defending any pending or threatened lawsuit, action or proceeding) incurred in connection with the foregoing (collectively "Damages") suffered or sustained by such Covered Person by reason of any act, omission or alleged act or omission by such Covered Person arising out of such Covered Person's activities taken on behalf of the Company, or at the request or with the approval of the Company, or in furtherance of the interest of the Company; *provided, however,* that the acts, omissions or alleged acts or omissions upon which such actual or threatened actions, proceedings or claims are based did not constitute willful misconduct or gross negligence.

(b)     Indemnification Procedure. A party seeking indemnification from the Company pursuant to subsection (a) (an "Indemnified Party") shall give prompt notice to the Company of the assertion of any claim, including any claim brought by a third party, in respect of which indemnity may be sought hereunder (a "Claim") and shall give the

Company such information with respect thereto as the Company may reasonably request, but no failure to give such notice shall relieve the Company of any liability hereunder except to the extent the Company has suffered actual prejudice thereby. The Company shall have the right, exercisable by written notice (the "Notice") to the Indemnified Party (which Notice shall state that the Company expressly agrees that as between the Company and the Indemnified Party, the Company shall be solely obligated to satisfy and discharge the Claim) within 30 days of receipt of notice from the Indemnified Party of the commencement of or assertion of any Claim, to assume the defense of such Claim, using counsel selected by the Company and reasonably acceptable to the Indemnified Party; except that the Company shall not have the right to assume the defense of a Claim (A) seeking an injunction, restraining order, declaratory relief or other nonmonetary relief against the Indemnified Party (whether or not the Company is also named as a party) or (B) if the named parties to any such action (including any impleaded parties) includes both the Indemnified Party and the Company and the Indemnified Party shall have been advised by counsel that there are one or more legal or equitable defenses available to the Indemnified Party which are different from those available to the Company; in which case such Indemnified Party shall have the right to participate in the defense of a Claim of the type set forth in clause (A) and/or (B) above and all Damages in connection therewith shall be reimbursed by the Company. In addition, if the Company fails to give the Indemnified Party the Notice complying with the provisions stated above within the stated time period, the Indemnified Party shall have the right to assume control of the defense of the Claim and all Damages in connection therewith shall be reimbursed by the Company upon demand of the Indemnified Party. In any event, no party assuming the defense of any Claim shall have the right to compromise or settle any claim for non-monetary relief against the other party or any claim for monetary relief against another party without such party's consent (which consent shall not be unreasonably withheld or denied) unless such monetary relief is paid in full by the settling party.

If at any time after the Company assumes the defense of a Claim any of the conditions set forth above are no longer satisfied, the Indemnified Party shall have the same rights as if clause (A) or (B) in the preceding paragraph had been satisfied and the Company never assumed the defense of such Claim.

The Company or the Indemnified Party, as the case may be, shall in any event have the right to participate, at its own expense, in the defense of any Claim which the other is defending.

The Company, if it has assumed the defense of any Claim in accordance with the terms hereof, shall have the right, upon five (5) business days prior written notice to the Indemnified Party, to consent to the entry of judgment with respect to, or otherwise settle, such Claim unless (i) the Claim involves equitable or other non-monetary damages or (ii) in the reasonable judgment of the Indemnified Party such settlement would have a continuing material adverse effect on the Indemnified Party's business (including any material impairment of its relationships with customers and suppliers). In the case of (i) and (ii) above, such settlement may be made only with the written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed. If the Indemnified Party otherwise assumes the defense of a Claim, it shall have the right to settle such Claim only with the consent of the Company.

Whether or not the Indemnifying Party chooses to defend or prosecute any Claim involving a third party, all the parties hereto shall cooperate in the defense or prosecution thereof and shall furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested in connection therewith.

(c)    Right to Advancement of Expenses.  Except as expressly prohibited by Law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in subsection (a).

(d)    Insurance.  The Company may purchase and maintain insurance, to the extent and in such amounts as the Members shall deem reasonable, on behalf of Covered Persons and such other Persons as the Members shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.  The Company may enter into indemnity contracts with Covered Persons and such other Persons as the Members shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this Section 18 and containing such other procedures regarding indemnification as are appropriate.

(e)    Non-Exclusivity of Rights.  The rights conferred on any person by this Section 19 shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate, agreement, vote of Members or otherwise.

(f)    Amendment or Repeal.  Any repeal or modification of this Section 19 shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

(g)    Changes in Law.  References in this Section 19 to Law shall be to such Law as it existed on the date this Agreement was executed or as such law thereafter may be changed; provided that (i) in the case of any change which limits the indemnification rights or the rights to advancement of expenses which the Company may provide, the rights to indemnification and to the advancement of expenses provided in this Section 19 shall continue as theretofore agreed upon to the extent permitted by law; and (ii) if such change permits the Company without the requirement of any further action by the Members to provide broader indemnification rights or rights to the advancement of expenses than the Company was permitted to provide prior to such change, then the rights to indemnification and the advancement of expenses shall be so broadened to the extent permitted by Law.

770848.2

(h)    <u>Applicability</u>.  The provisions of this Section 19 shall be applicable to all actions, suits or proceedings commenced after its adoption, whether such arise out of acts or omissions which occurred prior or subsequent to such adoption and shall continue as to a person who has ceased to be a Covered Person, and shall inure to the benefit of the heirs and personal representatives of such person.

20.    <u>Miscellaneous</u>.

(a)    <u>Indulgences, Etc</u>.  Neither the failure nor any delay on the part of any party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

(b)    <u>Controlling Law</u>.  This Agreement shall be governed by and interpreted and enforced in accordance with the substantive Laws of the State of Pennsylvania (including, without limitation, provisions concerning limitations of actions), without reference to the principles governing the conflict of laws applicable in that or any other jurisdiction.

(c)    <u>Notices</u>.  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made and received only when delivered (personally, by reputable courier service such as Federal Express, or by other messenger) or when deposited in the United States mails, registered or certified mail, postage prepaid, return receipt requested, addressed as set forth below:

If to the Company:

c/o Michael Dickerson, Chief Operating Officer/Chief Pilot
1475 Highland Avenue Road
Gettysburg, PA 17325

If to a Member:

To the address of such Member appearing in <u>Annex A</u> or such other address as appears in the records of the Company.

Any party may alter the address to which communications to such party are to be sent by giving notice of such change of address to the other parties in conformity with the provisions of this

-16-

770848.2

paragraph for the giving of notice.

(d)    Binding effect. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns.

(e)    Execution in counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. If executed in multiple counterparts, this Agreement shall become binding when any counterpart or counterparts, individually or taken together, bear the signatures of all of the parties.

(f)    Severability. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by Law.

(g)    Entire agreement. This Agreement constitutes the entire understanding among the Members with respect to the subject matter hereof and supersedes all prior agreements, express or implied, oral or written, with respect thereto. The express terms of this Agreement control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

(h)    Amendments to this Agreement and the Certificate. No alterations, modifications, amendments or changes to this Agreement or the Certificate of Organization shall be effective or binding upon the Members unless the same shall have been approved by a Majority Vote of the Members; provided, however, no consent of any of the Members, shall be required to amend and/or modify this Agreement or the Certificate of Organization to the extent that a Member's Percentage Interest is to be recalculated pursuant to the terms and conditions of Section 6(b) and such recalculation shall be automatic.

(i)    Construction. Whenever the context requires, the gender of any word used in this Agreement includes the masculine, feminine or neuter, and the number of any word includes the singular or plural. All references to sections refer to sections of this Agreement, and all references to annexes are to annexes attached hereto, each of which is made a part hereof for all purposes. The headings in this Agreement are for convenience only; they form no part of this Agreement and shall not affect its interpretation.

(j)    Number of days. In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any time period falls on a Saturday, Sunday or holiday, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or holiday.

(k)    Specific performance. The parties recognize that irreparable injury will result

-17-

770848.2

from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

**IN WITNESS WHEREOF**, the undersigned have executed and delivered this Agreement as of the date first above written.

MANAGER:

*Michael Dickerson*

Michael Dickerson, as Manager

770848.2

## ANNEX A

| MEMBER (Name) | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| Michael Dickerson | $5,000 | 100% |

770848.2

## ANNEX B

## FINANCIAL AND TAX MATTERS

B.1.    Definitions.    In addition to the terms defined in other provisions of this Agreement, including, without limitation, Section 1, the following terms shall have the meanings set forth below:

"Net Income" or "Net Loss" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, other than items of income or loss specially allocated pursuant to this Agreement, as determined by the Company's accountants in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in Net Income or Net Loss), with the adjustments required to comply with the Capital Account maintenance rules of Treasury Regulation Section 1.704-1(b), including the rules relating to (i) revaluations in the case of distributions of Company property in kind and the optional revaluation of Company property and (ii) utilizing "book" depreciation, cost recovery or amortization as determined under Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3) if there is a difference between the fair market value of contributed or revalued property and the adjusted tax basis of such property. The Members shall cause the Company to revalue property as required or permitted under the applicable Treasury Regulations.

"Regulatory Allocations" means allocations of Net Income and Net Loss (or items thereof) and Company indebtedness in accordance with the following:

(i)    The non-recourse deductions of the Company (within the meaning of Treasury Regulation Section 1.704-2(b)(1) and (c)) shall be allocated among the Members in accordance with their respective Percentage Interests.

(ii)    Allocations of Net Income or Net Loss (or items thereof) shall be made consistent with the requirements of Treasury Regulation Section 1.704-2(e), including, without limitation, those provisions relating to allocations of income and deductions attributable to non-recourse debt and partner non-recourse debt. Allocations that would conform to those required by a "minimum gain chargeback" (as defined in Treasury Regulation Section 1.704-2(f)) in addition to the requirements of Treasury Regulation Section 1.704-1(b)(2)(ii)(d), relating to a "qualified income offset," and Treasury Regulation Section 1.704-2(i)(4), relating to the chargeback on account of a decrease in minimum gain attributable to partner non-recourse debt, shall be made in a manner, at a time, and in the amounts consistent with those provisions.

(iii)    The "excess non-recourse indebtedness" of the Company (within the meaning of Treasury Regulation Section 1.752-3(a)(3)) shall be allocated among the Members in accordance with their respective Percentage Interests.

(iv)    Solely for federal income tax purposes, items of income, gain, loss and deduction shall be allocated among the Members in a manner so as to take into account the difference between the income tax basis of any Company property contributed by a Member to the Company immediately after its contribution to the Company and its value for purposes of this Agreement, as required by Section 704(c) of the Code. The Members, in their absolute discretion, may elect to account for the book-tax variation using any method permitted under the applicable Treasury Regulations.

"Tax Matters Member" has the meaning set forth in Section B.4 of this <u>Annex B</u>.

B.2.    <u>Capital Accounts</u>. A separate Capital Account shall be established and maintained for each Member under this Agreement. The Capital Account of each Member shall be credited with the cash and the agreed value of any property (net of liabilities assumed by the Company and liabilities to which such property is subject) or services contributed to the Company by such Member, plus all income, gain, or Net Income of the Company allocated to such Member pursuant to Section B.3 (including Net Income and income and gain exempt from tax), and shall be debited with the sum of (i) all Net Losses or deductions of the Company allocated to such Member pursuant to Section B.3, (ii) such Member's distributive share of expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as so described under Treasury Regulation Section 1.704-1(b)(2)(iv)(i)), and (iii) all cash and the fair market value of any property (net of liabilities assumed by such Member and the liabilities to which such property is subject) distributed by the Company to such Member pursuant to Section 10. The amount of the Capital Account of a Member shall be determined in accordance with the rules set forth in Treasury Regulation 1.704-1(b). Any references in any Section or subsection of this Agreement to the Capital Account of a Member shall be deemed to refer to such Capital Account as the same may be credited or debited from time to time as set forth above. It is the intention of the Members to satisfy the capital account maintenance requirements of Treasury Regulation Section 1.704-1(b)(2)(iv), and the foregoing provisions defining Capital Accounts are intended to comply with such provisions.

B.3.    <u>Allocations of Net Income or Net Loss</u>.

(a)    <u>Allocation of Net Income or Net Loss Generally</u>.  Except as otherwise provided in this Section B.3, Net Income or Net Loss, and all tax credits of the Company for each fiscal period, shall be allocated among the Members in accordance with their respective Percentage Interests.

(b)    <u>Regulatory Allocations</u>. Company Net Income and Net Loss (and items thereof) and Company indebtedness shall be specially allocated in accordance with the Regulatory Allocations, to the extent applicable, and Regulatory Allocations of Company Net Income and Net Loss (and items thereof) shall be made prior to other allocations of Net Income or Net Loss under this Agreement.

(c)    <u>Allocations and Distributions with Respect to Percentage Interests Transferred</u>. If a Percentage Interest is transferred, there shall be allocated to each Member who held the transferred

-21-

Percentage Interest during the Fiscal Year of transfer the product of (a) the Net Income or Net Loss allocable to such transferred Percentage Interest for such fiscal year and (b) a fraction, the numerator of which is the number of days such Member held the transferred Percentage Interest during such Fiscal Year and the denominator of which is the total number of days in such Fiscal Year; provided, however, that the Company shall allocate the Net Income or Net Loss by closing the Company's books immediately after the transfer of any Percentage Interest if requested by the transferor or transferee of the Percentage Interest within forty-five (45) days after the close of the taxable year in which the transfer occurred. Either allocation shall be made without regard to the date, amount or recipient of any distributions which may have been made with respect to any such transferred Percentage Interest.

B.4.    Tax Matters.

(a)    Tax Elections.

(i)    The Members shall cause the Company to make the election under Section 754 of the Code to adjust the basis of the Company's property in the case of a transfer of an Interest by sale or exchange or upon the death of a Member, if the transferee becomes a substitute Member, and the transferee requests that the Company make the election, in writing, not later than thirty (30) days after the close of the Fiscal Year in which the event giving rise to the adjustment for which an election is needed occurs. The Members may also, in their discretion, cause the Company to make an election at any time without a request to do so.

(ii)    The Company shall take any action necessary to be taxed as a "partnership" for federal and state income tax purposes and neither the Company nor any Member shall take any action that would result in the Company being taxed as other than a "partnership" for federal income tax purposes, including (but not limited to) electing to be taxed as other than a "partnership" by filing Form 8832, "Entity Classification Election."

(iii)    All other tax elections on behalf of the Company may be made or rescinded in the discretion of the Members.

(b)    Tax Matters Member. The Member holding a majority of the Percentage Interest shall appoint the "tax matters member" within the meaning of the Code.

770848.2